## DALLAS TERM, 1903.

### Ex· Parte Charles Lewis.

#### No. 2576.   Decided March 25, 1903.

**1.—City Charter—Municipal Ordinance—Habeas Corpus—Quo Warranto.**

A party restrained of his liberty by virtue of an ordinance passed, under an unconstitutional charter, by a board of commissioners partly appointed by the Governor to act in lieu of the city council, is properly entitled to, and his remedy is, habeas corpus to test the constitutionality of the ordinance; and it is not necessary that he should resort to quo warranto proceedings to test the authority of the board of commissioners to act officially in the premises. It has never been held, that where a pretended officer is acting by virtue of a commission which is absolutely void his acts can not be questioned in a collateral proceeding.

**2.—Corporation Officers—Right to Office.**

It is elementary that corporation officers must derive office from the corporation. This has been settled law from time immemorial.

**3.—Constitutional Law—Local Self-Government.**

Our Constitution can not be understood or carried out at all, except on the theory of local self-government, and the intention to preserve it is quite apparent. The Legislature has no right, under the guise of its law-making authority, to overturn the principles of local self-government. They have the right to create offices and prescribe the duties incident to the office, but the filling of the offices belongs to the people of the locality.

**4.—City Charter and Ordinance—Constitutional Law—Appointment of a Board of Commissioners by the Governor in Lieu of City Council Elected by the People.**

By the Act of Twenty-seventh Legislature, April 19, 1901, the 'charter of the city of Galveston was so amended as to do away with the city council and create a board of five commissioners, two to be elected and three to be appointed by the Governor, one of whom he was to designate as president. This board was, to all intents and purposes, a board of aldermen, and its president, who also had the right to vote with the board, was virtually the mayor. Their successors were, where there were vacancies on the board, to be appointed by the Governor. Held, the charter was violative of local self-government and violative of the Constitution, Bill of Rights, sections 1 and 2, and article 6, sections 2 and 3, which gave to city electors "the right to vote for mayor and all other elective officers;" and hence an ordinance passed by such board of commissioners' was absolutely void. Brooks, Judge, dissents.

Appeal from the Criminal District Court of Galveston. Tried below before Hon J. K. P. Gillaspie.

Appeal from a judgment and order of court on a habeas corpus proceeding which remanded relator to custody for a violation of an ordinance of the city of Galveston, for which he had been fined $25.

The case is sufficiently stated in the opinion.

45 Crim.—1.

*Marsene Johnson,* for relator.—Appellant's conviction, and his confinement in jail following, is illegal because the ordinance or act relator is charged with violating was enacted and ordained by a body calling itself the board of city commissioners of the city of Galveston, and because said ordinance was not enacted nor ordained by the city council of said city, composed of the mayor and board of aldermen of said city, and because the power of enacting and passing municipal ordinances for the government and regulations of the inhabitants of incorporated cities and towns is vested by the Constitution and laws of the State of Texas in the city council, composed of the mayor and board of aldermen of said incorporated city, and not in any real or pretended board of city commissioners of said city; and because the law-making power for the government of cities can not by the Legislature, under the inhibition and limitations of the Constitution of the State of Texas, be delegated to any other power in said city than the elected mayor and board of aldermen, who must compose the city council of said city. Can a board of city commissioners have the power, under the Constitution and laws of Texas, to enact and to ordain criminal laws and provide penalties, and to imprison citizens for the violation thereof? Can there be a municipal incorporation in the State of Texas without the election by the qualified voters in said city of a mayor and board of aldermen, who must constitute a city council, a city legislature, if the court please, and the members of which city council shall be elected by the people who live in such city, who are the stockholders in the corporation, who have the guaranteed constitutional right to elect the mayor and board of aldermen, who are ipso facto president and board of directors of such corporation?

The Constitution of Texas answers all of the above questions in the negative, in section 3 of article 6, under the title "Suffrage," which declares that "All qualified electors of the State who shall have resided for six months immediately preceding an election within the limits of any city or corporate town, shall have the right to vote for Mayor and all other elective officers."

Construing this article and section of our State Constitution, the Supreme Court of Texas in the case of State ex rel. McAlister, 88 Texas, 284, opinion by Mr. Justice Brown, uses this language on page 285, sixth paragraph:

"At the time the Constitution was adopted there were many cities and towns in the State organized under the laws of 1875, and under special acts, in which the same provision, in substance, for electing aldermen was embraced. In fact it was the well known and common method of city government. The effect that is claimed for the Constitution in this particular would have operated to annul all such provisions in the general law and in special charters, thus changing the established plan of municipal government. The purpose to destroy a system of municipal government so common in the State will not be attributed to the convention that framed the Constitution, unless the

language used is so certain as to compel such a construction by the courts.

"The language of article 6, section 3, of the Constitution," continues the Supreme Court, on page 287 of the opinion, "indicates the intention to have been to divide the voters into two classes, and to secure the rights of each upon two principal subjects of elections: First, in the election of city officers all of the qualified electors under the Constitution, upon residence in the city for six months prior to the election, were secured in the right to vote. The reason is obvious, because these officers deal with the rights of all citizens alike in the general government of the city. * * * This section of the Constitution does not prescribe that all elective officers shall be elected by the voters of the entire city, but it simply secures to the voters of each city the right to cast their ballots for all officers to be elected for the particular subdivision of the city for which such officers are chosen."

We trust the court will pardon us for reproducing so much of the court's opinion in the McAllister case cited, but the language used by the Supreme Court so completely covers the point we desire to bring before this court that we can add nothing original thereto. Const. of Texas, art. 6, sec. 3; State ex rel. v. McAlister, 88 Texas, 284; Denison v. Foster, 90 Texas, 23.

Appellant complains in his application for discharge on habeas corpus, hereinbefore fully set out, that he was tried and convicted in and by an illegal court; by a court which was neither a constitutional, State or municipal court—i. e., in a court called the recorder's court of the city of Galveston.

By the agreed statement of facts, your honors will see that prior to the Act of 1901 there had been duly and legally organized in the city of Galveston, by the mayor and board of aldermen thereof, a State court, known as the corporation court, in conformity with what is known as the general corporation court bill enacted by the Twenty-sixth Legislature of the State of Texas. Gen. Laws 1899, under the caption "An act to establish and create in each of the cities, towns and villages of this State a State court, to be known as the corporation court in such city, town or village, and to prescribe the jurisdiction and organization thereof, and to abolish municipal courts." White's C. C. P., p. 68, et seq.

We submit that while the General Laws of the State passed in 1899, and valid and subsisting law at this time, provide that the judge of the corporation court in the city of Galveston shall be appointed by the mayor elected by all the people who are voters in said city, this special act of 1901, of which we here complain, not only attempts to abolish a State court, but attempts to provide a new way of organizing a new court, for which there is no necessity, for as no legal successor or successors to the mayor and board of aldermen of the city in office have ever been elected and qualified, so the mayor and board of aldermen remain legal officers of said city until the legal election and qualifica-

tion of their legal successors; so the legal State corporation court and the judge thereof in office in said city at the time of the attempted operation of said illegal acts of 1901, never having been succeeded by a legal successor nor superseded by a legal court, remains the only municipal court in said city.

The doctrine of local self-government perpetually obtains to matters pertaining to the private as distinguished from the public functions of the municipality. This distinction is illustrated by Davock v. Moore, 105 Mich., 120, 28 Law. Rep. Ann., 783, 63 N. W. Rep., 424, which upholds an act establishing a city board of health to be appointed by the Governor with the advice and consent of the senate. The opinion refers to the distinction between public and private functions, and says that in the discharge of public duties there is no right of local self-government involved, and that the care of the public health is within the police power, and therefore within the control of the Legislature.

The limitations of the doctrine are further illustrated by People ex rel. Attorney-General v. Detroit, 29 Mich., 108, which upholds a statute so far as it transfers to a board of public works, to be appointed by the mayor and common council, powers formerly exercised by the board of sewer commissioners. Judge Cooley, who wrote the opinion, assented to the position that the common council of a city—i. e., the board commonly known by that name—is a distinctive and inseparable feature in municipal government, and that the Legislature can neither abolish it nor strip it of its legislative powers.

Respondent insists that the Galveston commission bill or new charter is a temporary measure, and cites Luehrman v. Taxing Dist., 2 Lea (Tenn.). Indeed, we believe respondent relies almost solely upon that case. Respondent is entitled to all the balm in Gilead it may be able to take unto itself in that case. First, because we submit that it was indeed a temporary provision; second, because the Legislature of that State (Tennessee) was not restrained in its action by the provisions of the Constitution of Tennessee. We quote from the opinion of the majority of the court, delivered by Justice Cooper: "The government of incorporated towns had been based upon the idea of local self-government by popular representation, its prototype being the form of the State government. Several of the State constitutions, in order to secure the permanency of the form, have expressly provided that the filling of the municipal offices, either by election or appointment, shall belong to the local authority. People v. Hurlbut, 24 Mich., 44; Metropolitan Board of Health v. Heister, 37 N. Y., 661; Speed v. Crawford, 3 Met., 207; People v. Chicago, 51 Ill., 17. * * * In the absence of such restraints, and our Constitution contains none, the maxim of republican government that local affairs should be managed in the local district is subject, all the authorities agree, to such exceptions as the legislative power shall see fit to make. The Legislature has the power to do whatever is not expressly, or by necessary implication forbidden by the Constitution."

Going into Indiana, we desire to especially call the court's attention to the very latest case we have been able to find on the subject of interference by the Legislature with right of a city to local self-government. We cite the case of State ex rel. v. Fox, 56 Law. Rep. Ann., 893, and close this brief and argument with the following excerpt from that case, on page 898: "The power contended for by appellants is far reaching. If the Legislature may empower the Governor to appoint a commission of his own choosing to take dominion and management of the fire establishment of the city of Fort Wayne, without the consent of the city, then the Governor may from the same source of authority be empowered to appoint, through his commission, of one man for that matter, every municipal officer, except judicial, in every city and town in the State. He is a brave advocate who will undertake to maintain that the people intended, by implication, to delegate to their legislative servants the power to provide for the appointment, as caprice might dictate or party interest require, of the mayor and members of the common council, and every other governing officer of a city, except those invested with judicial functions. To thus deprive the people of a locality of the right to choose their own immediate local officers is to rob them of their freedom, and to defeat one of the great ends for which the government was established."

Further authorities in support of relator: O'Connor v. Fond du Lac, 53 Law. Rep. Ann., 831, and the cases there cited; State ex rel. v. Moores, 55 Neb., 480, 41 Law. Rep. Ann., 624; People v. Hurlbut, 24 Mich., 44.

*C. K. Bell,* Attorney-General, and *J. Z. H. Scott,* for respondent.—
1. In Texas the State is the political unit. Her people as an entirety have ever asserted their sovereignty, and their right and purpose to alter, reform or abolish at pleasure their form of government so long as it is republican in form. Const. 1876, Bill of Rights, sec. 2.

2. Subject to the express limitations of her Constitution all her sovereignty is vested in the Legislature for making and unmaking of laws, and the establishment and maintenance of government not only for the State at large but for every locality within her borders; hence the Legislature is the fountain of all authority not given in express terms by the Constitution. Const. 1876, art. 2, sec. 1; Const. 1876, art. 3, sec. 1.

3. The Constitution has with minute particularity provided a complete scheme for the organization of the general government of the State, and of the counties and of the courts of ordinary jurisdiction, creating and defining the functions of the various offices and prescribing how they shall be filled, whether by election or appointment, and how they may be removed. Const., art. 3, secs. 1, 3, 4; art. 4, secs. 2, 10, 12, 16, 17, 21, 22, 23, 26; art. 5, secs. 1, 2, 4, 5, 6, 7, 9, 15, 16, 18, 20, 21, 23, 24, 28.

On the other hand the incorporation of cities and towns, their or-

ganization and authority and the names and functions of their various officers is left exclusively to legislative discretion as to which shall be incorporated, and to legislative wisdom as to what officers, powers and purposes they shall have, distinguishing only between the smaller, which must have the same general features, and the larger, whose greater importance requires them to be treated specially. Const., art. 11, secs. 4, 5.

4.   This accords with "common learning" on the general and essential principles of political existence and sovereignty, i. e., that municipal corporations are the mere agents of the general Legislature, created for the better government of the given locality. They are created entirely for the public weal, chiefly (though sometimes remotely) for that of the State at large, which is supreme, and incidentally for that of the local population, which (though often more immediate) is of secondary importance. In its discretion the Legislature as parens patriae may in the interest of the general or local welfare, and without reference to the will of the local population change, alter or abolish municipal corporations, and either provide special agencies for the government of the same territory and people, or let them lapse into the general body politic and become subject to the general laws. Blessing v. Galveston, 42 Texas, 657, 658; Graham v. Greenville, 67 Texas, 65; Buford v. State, 72 Texas, 184; State v. Goowin, 69 Texas, 59; State v. Brownson, 94 Texas, 439; United States v. Baltimore & O. Ry. Co., 17 Wall., 322; Meriewther v. Garrett, 102 U. S., 472, 26 Law. ed., 204, 205; Luehrman v. Taxing District, 2 Lea (Tenn.), 433, and cases cited; Dillon on Mun. Corp., sec. 30 (sec. 54, 4 ed.), and cases cited; Port of Mobile v. Watson, 116 U. S. (29 Law ed., 621), and cases cited; Jones v. Pensacola, Fed. Cases, No. 7488; Amy v. City of Selma, 77 Ala., 103; State v. Jennings, 27 Ark., 419; Town of Montpelier v. Town of East Montpelier, 28 Vt., 12; Burk v. State, 73 Tenn. (5 Lea), 349; Boyd v. Chambers, 78 Ky., 140; David v. Portland Water Com'rs, 14 Ore., 98; City of Philadelphia v. Fox, 64 Pa., 169; Daley v. City of St. Paul, 7 Minn., 390; Baltimore v. State, 15 Md., 376; State v. Swift, 11 Nev., 128; Commonwealth v. Plaisted, 148 Mass., 375.

5.   Local municipal government, in whatever form, is established and maintained not as a right inherent in or belonging to the people of the locality, but for the convenience and for the ends and purposes of the general State government at whose will and in whose wisdom municipalities are created, given form and authority, and are altered or abolished as the general or local welfare may require. This purpose generally consists with and is best subserved by intrusting the local government to officials elected from and by the people of the locality, whose self-interest and better knowledge of local conditions and necessities are most likely to achieve local prosperity and so minister to the general welfare. But whenever from incompetency, neglect, mismanagement, calamity or other cause, internal or external, the general or even the local welfare is imperiled, it is the high function and duty of the Legislature to intervene, and judging as well of the needed

remedy as of the occasion for its application, resume charge of the municipality, alter or abolish, partially or entirely, the previous order of things, and supply other and more efficient agencies.

Without going into details it is sufficient to say that the disaster of 1900 awakened the State and the whole country to the results of a half century or more of municipal government in Galveston—a condition of utter insolvency—about four millions of debt with little or nothing to show or provide for it. The city finances had been conducted on the basis of her expectations rather than of her real condition. Her future, so heavily discounted, proved unequal to the drafts made upon it. The Governor's inquiry as to what was available for immediate purposes of relief was answered that so far from having surplus funds the city's customary floating debt was in due course of accumulation. So utterly unsound was the city's condition, and so powerless was the locally elected government to deal with it, that measures for State relief were opposed by the Governor and in the Legislature unless the form of the city government was radically changed and the administration put more immediately under State control.

To save to the State at large her principal port, as well as to redeem the locality itself from the moribund condition to which sixty years of local self government had reduced it, the commission act was passed.

7. In the absence of constitutional restrictions the power of the Legislature over municipal corporations and the administration of their affairs is unlimited. David v. Portland Water Com'rs, 14 Ore., 98—case of legislative appointment of local officers.

Article 6, section 3, of our Constitution uses the following language: "All qualified electors of the State who shall have resided · for six months immediately preceding an election within the limits of any city or corporate town, shall have the right to vote for mayor and all other elective officers; but in all elections to determine expenditure of money or assumption of debt only those shall be qualified to vote who pay taxes on property in said city or incorporated town; provided, that no poll tax for the payment of debts thus incurred shall be levied upon the persons debarred from voting in relation thereto."

This is all which the Constitution contains on the subject of election of municipal officers.

If, for the sake of argument, we interpret the language here used as isolated and in its narrowest, most contracted sense, as by implication requiring an elective mayor· to be provided in every municipal corporation, it would not yet touch the question which the court is called on to decide in this case, viz., the validity of the ordinance under which the relator is convicted, because:

(a)   There is nothing here or elsewhere in the Constitution to require that the legislative branch of the city government shall be elective. They may therefore be appointed or chosen in any manner the Legis-

lature may see proper and provide, and their ordinances are nevertheless valid as the due exercise of delegated legislative power.

(b)   The mayor is not necessarily a part of the legislative body. The ordinary, as well as the legal definition of the word has no suggestion of legislative function.   The dictionaries (passim) define the term as meaning the chief executive officer or magistrate of a town or city, and say that in some places he is judge of the municipal court.

Our statutes, before and since the adoption of our Constitution, have treated the mayor chiefly and almost exclusively as an executive officer— his power to take part in legislation being confined to a casting vote in case of a tie, and to the exercise of a veto power, which he may use or not, and which may be overruled.   Act of March 5, 1875, Laws, chap. C, p. 113, secs. 3, 14, 17, 25; Rev. Stats., arts. 387, 401, 404, 412; See also Special Charter of Galveston, passed May 16, 1871, title 2, sec. 1; title 3, art. 2, sec. 1; art. 3, sec. 1; art. 4, sec. 1; art. 5, sec. 1; art. 6, sec. 1; title 4, art. 1, sec. 1; Charter of August 2, 1876, secs. 3, 12, 14, 15, 16, 25.

This limited voice in legislation does not inhere in the office of mayor, but is altogether statutory, and as there is no statute, either in the charter or elsewhere, expressly or by implication conferring such authority on a mayor in Galveston, he could not, even if elected, take part in the passage of an ordinance.   The legality of the ordinance in question therefore does not depend on the existence of a mayor, elected or appointed.

(c)   If the president of the commissioners be regarded as a mayor because he exercises the ordinary executive powers of that office, and should therefore be elected, it is only because of and in connection with his executive functions that objection can be made to his appointment. As legislator he does not use the ordinary functions of a mayor, and the legislative capacity being conferred on him solely as an appointed member of the commission and not expressly nor by implication in any other capacity, it follows that as legislator he need not any more than any other commissioner be elected to make his acts valid.  See extract infra from opinion of Campbell, C. J., in People v. Hurlbut, 24 Mich., 83.

8.   The Constitution, however should be interpreted on broader considerations than suggested in paragraph 7.   The provision in question should be regarded rather as defining the qualifications of voters at such elections as may be had, and not as prescribing that in every city (whether incorporated or not) and in every corporate town there shall be a mayor and other elective officers.   It is to be observed:

(a)   The clause occurs under the general head of suffrage and not in connection with constitutional directions concerning municipal organizations.   Art. 11.

(b)   The right to vote is predicated on an election being held; if there be no election the right does not arise.   So, too, of the words

"mayor and other elective officers"—if there be none, there can be no election nor any right to vote for them.

(c) The section is plainly intended to define qualifications of electors in cities and towns and distinguish between those electors for mere governmental purposes, and those that may vote pecuniary burdens. The word mayor is used to illustrate the distinction intended to be made between the two classes of voters. This is apparent not only from the section as an entirety, but from the use of the words "other elective officers" immediately following. If the court holds that the mayor is a constitutional necessity in every city (whether incorporated or not), and in every corporate town, it must hold that "other elective officers" are equally necessary, and therein declare also what officers are by the Constitution intended to be elective. That this was left to be done by the Legislature according to its discretion (generally with reference to smaller, and specially with reference to the larger cities), is too plain for argument. Const., art 11, secs. 4, 5.

It follows that the Legislature, having unlimited discretion as to the creation of officers and prescribing their duties according to occasion as they arise, may in their discretion also, as occasion may demand, curtail the number and authority of municipal officers, even to their entire abolition. It can not be said that a mayor or any other elective officer must be provided, whether he is needed or not. Nor can the court substitute its own judgment for that of the Legislature as to when and under what circumstance any given officer or official functions are needed.

10. What has been said above ought to dispose of all appellant's objections to the organization and authority of the recorder's court. In Blessing v. Galveston, Judge Moore states that the legislative power to grant municipal charters and therein to delegate its own legislative authority includes the power to provide for enforcement of the ordinances passed by the municipal authorities and to organize a recorder's court to that end. This court has held that such recorder's courts have no jurisdiction of offenses against the penal laws of the State because of their being purely municipal in their nature and purpose, and general criminal jurisdiction being used in the same territory by courts created by general law. Ex parte Coombs, 38 Texas Crim. Rep., 648; Ex parte Wilbarger, 55 S. W. Rep., 968; Ex parte Sibley, 65 S. W. Rep., 372.

But it has been always conceded that for the purpose of enforcing municipal ordinances recorder's courts are proper and competent, the ordinary State courts having no jurisdiction of such matters. Cases supra.

The corporation court act providing generally for local courts with municipal jurisdiction abolished recorder's courts then existing and evidently intends to adopt the corporation court for all towns and cities. But as recorder's courts were competent for purely municipal purposes before they were so abolished, they are equally competent for

such purposes whenever the Legislature chooses to revive them. It could do this generally for all cities and towns, or specially for any city entitled to have a special charter. The Galveston commission act has undertaken to do this, and it is certainly as competent to be done since as well as before the corporation court act was passed.

9. The case from Michigan (People v. Hurlbut, 24 Mich., 44), cited in opposition to the position we maintain, involved the construction of a distinct provision of the Michigan Constitution: "Judicial officers of cities and villages shall be elected and all other officers shall be elected or appointed at such times and in such manner as the Legislature shall direct." The Michigan decision therefore is aside from our purpose, but it may be remarked that Judge Christiancy in construing the language of the Michigan Constitution confined himself strictly to the text of that instrument and drew no aid from foreign courts. His conclusion was legitimate and most probably entirely correct; his method of treating the subject was undoubtedly so.

Campbell, C. J., reasoned similarly to a like conclusion so far as purely local interests are concerned, but used this significant language: "But there is a clear distinction in principle between what concerns the State and that which does not concern more than one locality, and where the Constitution has made no rule for their management, affairs belonging to State policy must be subject to immediate State control, if the Legislature shall deem it necessary." P. 81.

And he reasoned with great clearness and force that the provision in question would not be held to curtail the general power of the State Legislature in dealing with matters of general public concern, though it did apply in the case then before the court, because the law affected matters entirely local only.

Judge Cooley, in his separate opinion, adopted a line of argument based upon matters entirely foreign to the Michigan Constitution and reached his conclusion by reasoning faulty in two important particulars:

1. In reasoning as above stated from supposed general principles rather than from and upon the written law which was before him for construction.

2. In a misconception and misapplication of the very doctrines that he advances to restrain the exercise by the Legislature of the sovereign power of the people. He insists that if the Legislature be allowed the exercise of such power the liberties of the people may be endangered by the abuse of such power, and therefore the courts must deny it. This proposition is politically vicious. All power is capable of abuse as well as proper exercise. The lodgment of legislative powers, whether unlimited or however qualified, in the elected agents of the people is founded in the presumption, conclusive upon courts as well as upon private citizens, that it will be used for the general good, and to prevent rather than cause mischief. In the exercise of their power errors of judgment and even corruption may impair the purpose of their au-

thority, but the correction of mistakes and abuses lies exclusively with themselves—the courts can not interfere. The Legislature, drawn from the people periodically and at short intervals, is to be presumed, in the absence of some very plainly written organic law to the contrary, to reflect the supreme will of the people. Individuals and political minorities may complain that its acts do not do so, but until the people through the same instrumentality denounce the act of one Legislature through its repeal by another, the objection must be confined to public agitation and discussion. The courts can not interfere without usurping legislative functions. The voice of the Legislature is more directly and undoubtedly the voice of the people than are the decisions of the court in all matters wherein the Legislature is not expressly deprived of authority by the written Constitution.

The other case cited, Leuhrman v. Taxing District, 2 Lea, decides the questions then before the court, and which are very similar to those which we have now under consideration, entirely in our favor. (True, there is a dissenting opinion by Judge Turney, but it is founded upon rather a narrow and strict construction of the special constitutional requirements concerning legislation in Tennessee. His argument is therefore exclusively local and has no force here.)

The only expressions otherwise of Judge Cooper are embraced in an a fortiori argument made on page 440 in favor of the particular act under consideration. Conceding for the nonce that his opinion may be unsound as a general proposition of law, he nevertheless justifies the act as a temporary if not as a permanent measure. This is conceded even by Judge Cooley in the case cited from Michigan (People v Hurlbut). In this connection we may remark that the charter of the city of Galveston is plainly a temporary measure, for no provision is made for its perpetuation by election or appointment of officers beyond the constitutional and charter limit of official existence—two years. Const., art. 16, sec. 30; Galveston Charter, sec. 25.

The case of State v. McAllister, 88 Texas, 284, quoted by the relator, must be read with reference to the issues before the court. There was no question but that there was an office by law made elective involved in that decision; the only matter of inquiry was the proper mode of election—whether by the city at large, under the general language of the Constitution, or by wards under the legislative act—and it was held to be clear that in using its own discretion the Legislature correctly interpreted and applied the spirit of the Constitution. The court, however, further held that if there was any doubt about the validity of the legislative provision the very doubt would be decisive of its validity.

It was further remarked by Judge Brown that "the words 'elective officers' mean such officers as the law makes elective," and he might have added that the right to vote at elections as here given means such elections as the law may provide to be held. The Constitution is no more mandatory for one than for the other.

The Constitution, article 9, sections 4 and 5, commits charters and organizations of cities and towns entirely to the Legislature.

On constitutional questions where human reason may pause and the judgment hesitate on account of uncertainty of meaning, broad considerations of expediency and public policy should have great weight in reaching a decision. Baltimore v. State, 15 Md., 376.

The Constitution must not receive a narrow technical construction as in the case of an ordinary instrument. It must be interpreted in the light of the great principles of government, so as to give effect to them and not defeat them. Hunt v. State, 7 Texas Crim. App., 212-231.

Constitutional limitations on legislative power should be clear and should be strictly construed so as to interfere as little as possible with the general functions of the Legislature. Baldwin v. State, 21 Texas Crim. App., 591-593.

It is common learning that the Legislature may repeal, alter or amend municipal charters at its discretion. Jones v. Pensacola, Fed. Case No. 7488; Amy v. City of Selma, 77 Ala., 103; State v. Jennings, 27 Ark., 419; Town of Montpelier v. Town of East Montpelier, 28 Vt., 12; Burk v. State, 73 Tenn. (5 Lea), 349; Boyd v. Chambers, 78 Ky., 140; Meriwether v. Garrett, 102 U. S., 52 (Law. ed.; book 29, 204); Blessing v. Galveston, 42 Texas, 641.

In the absence of constitutional restrictions the power of the Legislature over municipal corporations and the administration of their affairs is unlimited. (This is a case of legislative appointment of local officers.) David v. Portland Water Com'rs, 14 Ore., 98.

A city may have elective and appointive officers simultaneously, as in the case of San Francisco, where most of the officers were elective, but the board of police commissioners were appointed by certain district judges. Straude v. Election Com'rs, 61 Cal., 319-322.

In State v. Goowin, 69 Texas, 59, Stayton, C. J., says: "If the State desires to abolish a corporation created as provided by statute, it has ample power and means to do so."

Legislative provision of part (or all) of a municipal governing body is competent as being within the general legislative control over municipal corporations and the administration of their affairs. City of Philadelphia v. Fox, 64 Pa., 169.

It is competent on general principles for the Legislature to provide itself (immediately and independently of local authorities) for police commissioners of a city. Baltimore v. State, 15 Md., 376.

Legislature may appoint officers to discharge duties in cities and their acts are as valid as if done by local authorities. Daley v. City of St. Paul, 7 Minn., 390.

Legislative appointment of municipal officers not repugnant to Constitution where Constitution does not guarantee local self-government. State v. Swift, 11 Nev., 128.

Charter of Selma, Ala., repealed and resumption had by State of

municipal functions through agencies appointed by Governor, December 11, 1882. See Amy v. Selma, 77 Ala., 103.

Corporation created by Legislature not dissolved by failure to preserve organization, and subsequent attempt at incorporation under general law was void. State v. Dunson, 71 Texas, 65; Largen v. State, 76 Texas, 323; State v. Hoff, 29 S. W. Rep., 672 (Texas case).

Direct legislative control and regulation of local affairs of towns competent under general grant of legislative powers for general good. Commonwealth v. Plaisted, 148 Mass., 375.

The city of Washington, said to be the best governed city in the world, is ruled exclusively by Congress. Its people have no voice in its affairs—yet no one ever assailed its government as being opposed to republican principles or common right.

The right of suffrage is not inherent in the individual or community, but is entirely conventional; may be granted, regulated, abridged or taken away by the State. Anderson v. Baker, 23 Md., 531; Blair v. Ridgley, 41 Mo., 63; same cases, Brightly on Elections, 27-90.

Officers appointed to govern and tax the city of Detroit, whose voters had no other voice in their selection than as voters for representative in the general Legislature of the State, were held to be competent, and the moral or political rule that taxation and representation should go together was fulfilled. Objections or arguments contra must be addressed to the Legislature. The courts can not entertain them. People v. Mahaney, 13 Mich., 481.

"Public corporations are but parts of the machinery employed in carrying on the affairs of the State, and they are subject to be changed, modified or destroyed as the exigencies of the public may demand." Trustees of Schools v. Tatman, 13 Ill., 27-30.

"In respect to public corporations which exist only for public purposes, such as towns, cities, etc., the Legislature may, under proper limitations, change, modify, enlarge or restrain them." Story, J., in Dartmouth College v. Woodward, 4 Wheat., 698.

In Blessing v. City of Galveston, 42 Texas, 641, the suit was to enjoin collection of taxes under the city charter, which was alleged to be invalid because (1) it was not passed by legislation in conformity to the requirements of our Constitution; (2) it was imposed on the people of the city without their consent and without submission to them for approval or rejection; (3) the Constitution does not authorize the Legislature to delegate to the city authority to levy and collect taxes from the people; (4) the city ordinance under which the tax was levied was in conflict with the provisions of the State Constitution on the subject of taxes; (5) the recorder's court was not one contemplated by the general judicial system of the State as outlined in the Constitution, and was therefore no court.

Judge Moore, speaking for the court, remarks that provisions largely similar to those of our own Constitution had been the subject of much political and judicial discussion in other States, "resulting in marked

divergent and conflicting opinions and conclusions," and then proceeds to dispose of the questions raised by simple reference to the text of our own organic law. (He seems content to let other States settle each for itself all disputed questions relative to their home institutions, while he performs the same office for Texas without foreign assistance, as Judge Christiancy did in People v. Hurlbut, supra.) Treating however, of the general features of republican government and of the relations between the sovereign power of the State and its political subdivisions he says upon reason and abundant authority, cited and approved (pp. 657 to 659):

"No principle of law is more clearly or firmly settled than that public or municipal corporations, established for public purposes, such as the administration of local or civil government, are not in the nature of contracts between the State and the corporation, and that their charters may be annulled and revoked at the will and pleasure of the Legislature, as it deems the public good may require." "It is," said Justice Nelson, "an unsound and even absurd proposition that political power conferred by the Legislature can become a vested right as against the government in any individual or body of men." People v. Morris, 13 Wend., 325. "Public or municipal corporations are established for the local government of towns or particular districts. The special powers conferred upon them are not vested rights as against the State, but being wholly political, exist only during the will of the general legislature, otherwise there would be numberless petty governments existing within the State, forming part of it but independent of the control of the sovereign power." 16 How., 369. "Such corporations are the creatures of the State, made for a specific purpose, to exercise, within a prescribed limit, 'powers conferred upon them. The State may withdraw these local powers of government at pleasure, and may, through its Legislature, or other appointed channels, govern the local territory as it governs the State at large. It may enlarge or contract its powers or destroy its existence." United States v. Baltimore & O. Ry. Co., 17 Wall., 322.

Speaking to the fifth objection, supra, Judge Moore says the power of creating a recorder's court to enforce municipal regulations is a necessary incident of the power to create the municipal corporation and to confer on it the power of regulating municipal affairs. P. 661.

Meriwether v. Garrett, 102 U. S., 572, was a case that grew out of a series of acts of the Legislature of the State of Tennessee, whereby the previous charter of the city of Memphis was abolished and the administration of her municipal affairs was taken more immediately under control of the State government. On certificate of division of opinion between the judges of the Circuit Court the case went before the United States Supreme Court, which held the Legislature's acts in question to be competent and binding, as emanating from the sovereign power of the State of Tennessee in a matter wherein that sovereignty was supreme.

· In Buford v. State, 72 Texas, 184, there was question of the right of a town to ignore its incorporation and by neglect or nonuser to abandon and render nugatory its corporate capacity. The court cited, quoted and approved Blessing v. City of Galveston, 42 Texas, 659, and also the following language from Dillon on Municipal Corporations: "Hence it is, the people of the locality are erected into a corporation not for private but for public purposes. The corporation is mainly and primarily an instrument of government."

In State v. Dunson, 71 Texas, 65, where similar questions were raised it was held that the inhabitants of any locality have no authority independently of the legislative will to incorporate themselves nor to destroy their corporate capacity when created by legislative act. State v. Brownson, 94 Texas, 439.

In People v. Hurlbut, 24 Mich., 82, 83, Campbell, C. J., distinguishing between matters that concern the State and are therefore always subject to legislative control, and merely local concerns which the Constitution of Michigan has confided to the people of the locality, says:

"While the preservation of the public peace and the suppression of criminal disorders have very generally been intrusted more or less to the municipal authorities, this control has not been given to all municipalities, and has never been confined to any municipality without some exceptions and qualifications. There have always been officers of the peace neither elected nor appointed by local authority. * * * No municipality in this State was ever allowed to determine for itself what courts should be created within it, or to regulate their jurisdiction, or to delegate the powers of conservators of the peace to persons not indicated for that purpose by the legislative direction. And such was the law of England. Mr. Kyd says: 'If the king, by his charter, incorporate a town by the name of mayor and twelve aldermen, they will not have any power as conservators or justices of the peace without an express clause for that purpose; they can neither fine nor imprison, and if they assume such authority it will be an usurpation; and it is for this reason that charters usually add these powers by express words, and make the mayor or aldermen justices of the peace or jail -delivery; but they act in these capacities not because they are mayor or aldermen, but because, by the charter they are expressly annexed to their respective offices; and the union of different powers in one person does not confound his several and distinct capacities.' 1 Kyd on Corp., 327, citing 3 Mod., 12; 2 Ld. Raym., 1030." * * *

The same distinction was made by the same court in an opinion delivered by Judge Cooley in People v. Common Council of Detroit, 28 Mich., 228. He says, "In all matters of general concern there is no local right to act independently of the State, * * * and the State may enforce the performance of local duties, either by employing local officers for the purpose or through officers and agents of its own appointment. The proposition which asserts the amplitude of legisla-

tive control over municipal corporations when confined, as it should be, to such corporations as agencies of the State in its government, is entirely sound."

HENDERSON, JUDGE.—Appellant was convicted in the recorder's court of the city of Galveston for violating an ordinance of said city, and fined $25. Said ordinance was of a sanitary character, and prohibited the removal of the contents of any privy or water-closet, etc., except between certain hours, with the permission of the health physician, and in accordance with certain prescribed rules. This ordinance was passed by what is termed in the charter the "board of commissioners," who are in fact the board of aldermen of said city. For failing to pay said fine, appellant was committed to jail. He sued out a writ of habeas corpus before the criminal district judge of Galveston County, who, after hearing the evidence in said case, remanded applicant to the custody of the sheriff until said fine and costs should be paid. From this judgment applicant prosecuted an appeal to this court.

No question has been made as to the regularity of the proceedings which led up to and included the conviction; but appellant contends that said conviction was null and void, because the charter of the city of Galveston passed by the Twenty-seventh Legislature, and approved April 19, 1901, provides that the board of aldermen of the city of Galveston, called "board of commissioners," shall consist of five commissioners, three of whom are required to be appointed by the Governor; that, in accordance with said charter provision, the Governor did appoint said three officers, one of whom was named as the president of said board of commissioners and that these three constituted a majority of the board of aldermen of said city; that said board passed the ordinance in question, under which appellant was tried and convicted. The insistence is that the Governor has no authority, under the Constitution of this State, to appoint the members of said board, and that the charter provision authorizing him to do so is null and void, and that said ordinance, and all proceedings thereunder, are without authority of law. As the case turns upon the provisions of the charter with reference to the selection of the board of commissioners, who stand for the aldermen of said city, the provisions of the charter bearing on this subject will be quoted substantially: Section 5 provides: "There shall be appointed by the Governor of the State, as soon as possible after the passage of this act, three commissioners, one of whom he shall select and designate as president of the board of commissioners provided for herein, and within ten days after the passage of this act, it shall be the duty of the Commissioners Court of Galveston County to order an election to be held in the city of Galveston, at which election the qualified voters of the city of Galveston shall elect two other commissioners, who, together with the three commissioners appointed by the Governor, shall constitute the board of commissioners of the city of Galveston.

In ordering such election, the commissioners court shall determine the time and the places in the city of Galveston for holding such election; and the manner of holding the same shall be governed by the laws of the State regulating general elections. Each of said five commissioners shall be over the age of twenty-five years, citizens of the United States, and for five years immediately preceding their appointment or election, residents of the city of Galveston. Each of said five commissioners shall hold office for two years from and after the date of his qualification, and until his successor shall have been duly appointed or elected, as the case may be, and duly qualified. Said board of commissioners shall constitute the municipal government of the city of Galveston." Section 9 provides for the removal of appointees; authorizing the Governor to remove the commissioners appointed by him, but withholding from him the power to remove others. Section 10 provides for filling vacancies in the board occurring during the term of office, giving the power to the Governor. to fill vacancies occasioned by the resignation, etc., of his appointees; but others are to be filled in the same manner as State or district offices. Section 25 provides that the tenure of the board of commissioners shall be two years, and until their successors qualify, and that vacancies in said board are to be filled as provided in section 10. Certain sections make the president the executive officer of the city, and give him the right to vote on all questions which may arise. Other sections constitute the president and board of commissioners, the successors of the mayor and board of aldermen of the city of Galveston, and fix their salaries; and said board is given plenary powers, such as are usual with reference to the government of said city, authorizing them to pass all ordinances, etc.

We understand the respondent to contend, first, that the matter of the appointment of said members of the board of commissioners by the Governor can only be inquired into by quo warranto, and that this question can not be raised collaterally; second, that the Legislature is omnipotent in the creation of municipal corporations, unless restrained by the Constitution, and that there is nothing in the Constitution prohibiting the Legislature from granting to the Governor the power to appoint any or all of the members of the board of commissioners; third, that the appointment of the president of the board and two of the members was temporary, and, even if it be conceded that the Governor could not appoint the mayor and board of aldermen as permanent officers, it was competent to make a temporary appointment of such officers. We would observe, in this connection, that the appointments here authorized by the charter were not temporary in their character, but permanent, and that, when the time of the appointees of the Governor expired, their successors are to be appointed by the Governor. We understand this to be the plain reading of the charter provisions.

Is it necessary, in order to question the legality or constitutionality of an ordinance passed by the board of commissioners, to resort to a

45 Crim.—2.

quo warranto proceeding? Our statute (Rev. Stats., art 4343) provides for writs of quo warranto as against one who usurps, intrudes into, or unlawfully holds or executes any office or franchise. This is in consonance with the general nature of the writ of quo warranto; that is, it furnishes a remedy or mode to try the right to an office or franchise. High on Ex. Rem., secs. 591 to 621 inclusive. In State ex rel. John H. Spaulding v. Smith, 55 Texas 447, it seems to have been held, where the question involved was simply the right to collect taxes, and not a contest for the office, that proceedings by quo warranto was not the proper remedy. In this particular case there is no contest pending for the office of alderman. Nor is this a suit to forfeit the entire charter of the city of Galveston because it is unconstitutional, nor because of nonuse or abuse of its franchise. For aught that appears, it is conceded that all the provisions of said charter are in accordance with law, except the appointment of the three commissioners. It would not necessarily follow that because the appointment of some officer of a corporation was void, being unconstitutional, the whole charter must necessarily fail. In the city of El Paso v. Ruckman, 92 Texas, 86, it was held that the validity of the organization of the school board of the city of El Paso could only be inquired into by quo warranto. In that case it was held that the election was irregular, merely, and for those reasons might have been properly set aside in a proceeding instituted for that purpose. But we do not know that it has ever been held, where a pretended officer is acting by virtue of a commission which is absolutely void, his acts can not be questioned in a collateral proceeding. If such should be the case, the result would follow that if one assumed to act as judge, and undertook to try a person, although his commission be absolutely void, a person so arraigned and tried would be driven to some procedure to stay the trial, in order to enable him to resort to a writ of quo warranto to question the authority of the officer trying him. In such case he would be compelled to seek the aid of the district attorney, who is authorized to prosecute writs of quo warranto, in order to stay the hand of that same district attorney in the prosecution. As we understand the rule as applicable both to civil and criminal matters, if a judgment is absolutely void, either because there is no constitutional tribunal, or because such tribunal has no jurisdiction of the subject matter, its action can be questioned whenever and wherever it is invoked, either collaterally or otherwise. This is especially the rule in this court. See Ex parte Cross, 44 Texas Crim. Rep., 376—a recent case where an ordinance was held void because of the invalidity of the corporation. See, also, Ex parte Timmins, 32 Texas Crim. Rep., 117. In People ex rel. v. Whitcomb, 55 Ill., 172, it was said: "The proceeding in quo warranto will not lie to determine the constitutionality of a municipal law; but the proper mode to challenge such law would be to interpose an objection as a defense to the enforcement of the ordinance." And that rule, it occurs to us, accords in principle with the proper practice. And

see High on Ex. Rem., 618, and Stultz v. State, 65 Ind., 492.   We accordingly hold that appellant was not required to resort to the writ of quo warranto, but he could question the constitutionality of the ordinance in his defense when he was prosecuted thereunder.   If the ordinance was merely irregular, he could not set it aside; but, if it is void (that is, if we should hold that the appointment by the Governor of the mayor and two of the board of aldermen was unconstitutional, and that this rendered the ordinance, the passage of which was participated in by them, void, as being against the Constitution of the State), then he can interpose the defense on the trial, and can avail himself of it here, and he would not be compelled to await the action of those who might be prosecuting him, in order to avail himself of the writ of quo waranto.

In discussing the constitutionality of the appointment of the mayor and two of the aldermen by the Governor, it may be conceded:   First, that the burden is on relator to show, by the express terms of the Constitution, or by strong implication, that the exercise of the power of appointment is against the Constitution.   What we mean by "strong implication" is:   "When the validity of such legislation is brought in question, it is not necessary to show that it falls appropriately within some express written prohibition contained in the Constitution.   The implied restrictions of the Constitution upon legislative power may be as effectual for its condemnation as written words, and such restrictions may be found either in the language employed, or in the evident purpose which was in view, and the circumstances and historical events which led to the enactment of the particular provision as a part of the organic law."   State of Indiana ex rel. v. Fox (Ind. Sup.), 63 N. E. Rep., 19, 56 Law. Rep. Ann., 893, and authorities there cited.   Second.   The wisdom of the law is not a question; nor does it become the judiciary to try the issue as to whether the same appears expedient, politic, or necessary, these matters being exclusively within the province of the Legislature.

The Constitution of this State has never been construed as to the question here presented, but the subject has been thoroughly discussed in other jurisdictions—particularly in New York, Michigan, Indiana and Tennessee, and in some other States.   New York, as was observed by Mr. Coolev, is the only State of the original thirteen colonies in which the mayor was appointed by the Governor.   But this was changed at an early date, after the Revolution, and the Constitution in that State was made expressly and strongly prohibitive as to the appointment by the Governor or Legislature of purely municipal officers.   The discussion in that State, as in some others, turned upon the proposition as to whether the appointive officers were municipal or state officers; the decisions holding that certain classes of officers, as health, quarantine, and peace officers, were State, and not purely municipal, officers, and that it was not an invasion of local self government to appoint such officers through the Governor or Legislature.   State ex rel. Wood v.

Draper, 15 N. Y., 532; Rathbone v. Wirth, 150 N. Y., 459, 45 N. E. Rep., 15, 34 Law. Rep. Ann., 408. And to the same effect, see Board of Health v. Heister, 37 N. Y., 661; Davock et al. v. Chas. W. Moore (Mich.), 63 N. W. Rep., 424, 28 Law. Rep. Ann., 783. No question is or can be made here that the officers appointed were not municipal officers. Indeed, they were both executive and legislative officers of the city of Galveston; and the Legislature, in making these appointive, went further than the Legislature of any State ever attempted to go before.

In Michigan and Indiana the question has been discussed as applied to their Constitutions, both of which provide, in substance, "that all officers whose appointments are not otherwise provided for in their Constitutions, shall be elected or appointed in such manner as now is, or hereafter may be, prescribed by law." The decisions appear to be predicated in the proposition as to whether the appointing power, under said Constitutions, referred to the power of the Legislature or Governor, to appoint, or to the particular localities, and it was held that it referred to the localities. See People v. Hurlbut, 24 Mich., 44, 9 Am. Rep., 103; Allor v. Wayne Co. Auditors, 43 Mich., 76, 4 N. W. Rep., 492; Davock v. Moore (Mich), 63 N. W. 424, 28 Law. Rep. Ann., 783; Geake v. Fox (Ind. Sup.), 63 N. E. Rep., 19, 56 Law. Rep. Ann., 893; State ex rel. Holt v. Denny, Mayor, 118 Ind., 449, 21 N. E. Rep., 274, 4 Law. Rep. Ann., 65. And to the same effect, see Luehrman v. Taxing Dist. of Tenn., 2 Lea, 425. This last case followed People v. Hurlbut, supra, in holding that the Governor was authorized to make temporary appointments of municipal officers. But the reasoning in all of the cases—those referred to as well as all others—to which our attention has been called, except State of Nevada v. Swift, 11 Nev., 134, strongly supports the proposition that, even without some express constitutional provision, neither the Legislature nor the Governor has the power to appoint the permanent officers of a municipality. In the cases cited it occurs to us that the real effect of the decisions was to establish the doctrine that, in the absence of a grant of authority in the Constitution authorizing the appointment of such local officers by the Legislature or the Governor, this power was denied by implication arising from the history and traditions which time out of mind had conferred local self-government on municipalities. This question is presented so forcibly by the distinguished judges who decided the Hurlbut case, and in language so much better than we can use, that we here present excerpts from the same, both on account of the historical facts recited, and because of the eloquent language in which the opinions are couched, and, moreover, because, in our judgment, it will afford good reading to those who would ascertain the underlying principles which uphold our republican institutions, and also serve to bar the way of those who desire to overthrow the principles of local self-government, and to establish in lieu thereof a strong central power.

Chief Justice Campbell uses this language: "Incorporated cities and boroughs have always, both in England and in America, been self-governing communities, within such scope of jurisdiction as their charters vest in the corporate body. According to the doctrine of the common law, a corporation aggregate for municipal purposes is nothing more nor less than 'investing the people of the place with the local government thereof.' Salk. 193. In the absence of any provision in the charter creating a representative common council, the whole body of freemen make the common council, and act for the corporation at their meetings. Comyn Dig., Franchises (F), 25. It is agreed by historians that originally all boroughs acted in popular assembly, and that the select common council was an innovation, which may have been of convenience, or by encroachment. In modern times cities have generally acted in ordinary matters by such a select body. But townships still act by vote at town meetings, and for many purposes connected with taxation the people of cities usually have the same privilege. But whether acting directly or by their representatives, the corporation is, in law, the community, and its acts are their acts, and its officers their officers. The doctrine is elementary that all corporation officers must derive office from the corporation. Kyd, Corp., chap. 3, sec. 8. This has been, from time immemorial, settled law. By articles 15 and 16 of the Great Charter, it was stipulated that the liberties and free customs of London, and all other cities, boroughs, towns and ports, should be preserved. Those liberties were all connected with and dependent upon the right to choose their own officers and regulate their own local concerns. The sole motive of the infamous proceedings of Charles II to procure the forfeiture of these corporate charters was to enable him to interfere in the selection of corporate officers. When he had secured a decision against the city of London, adjudging the charter forfeited on trumped-up charges of sedition and illegal tolls, he offered, through Lord Keeper North, to respite the judgment if the city could give him such right of control over its selection of officers as to enable him to exclude persons not acceptable to the crown. 8 State Trials, 1281; Lives of Lord Chancellors, vol. 4, pp. 318, 319. These interferences with both the English and American colonial charters were always regarded as legal outrages, and contrary to all constitutional principles, and one of the first acts of Parliament, after the revolution of 1688, was passed to prevent any future action of that kind. Our Constitution can not be understood or carried out at all, except on the theory of local self-government, and the intention to preserve it is quite apparent. In every case where provision is made by the Constitution itself for local officers, they are selected by local action. All counties, towns and school districts are made to depend upon it. All elections are required to be in local divisions where electors reside. Cities are represented in the board of supervisors, and it is quite possible for their members to outnumber the rest. It certainly can not be that the State can control those bodies by sending its own agents there, and it can not be

possible that it was contemplated that any members of that board should be selected by a different mode of 'election or appointment from the rest. Cities may become counties, and surely there can be no county without popular institutions. Cities have been judicially declared to come within the denomination of 'townships,' so far as to be entitled to library money; and, unless they are made to include school districts, they need not be compelled to have free schools. No one would venture to assume that the Constitution was designed to leave them in such a position. It is impossible to read that document without finding the plainest evidence that every part of the State is to be under some system of localized authority emanating from the people. This is no mere political theory, but appears in the Constitution as the foundation of all our polity. There is no middle ground. A city has no constitutional safeguards for its people, or it has the right to have all its officers appointed at home. Unless this power is exclusive, the State may manage all city affairs by its own functionaries. The only reasonable meaning of the constitutional clause in question is that, when the Legislature has designated the time and manner of appointment or election, the local authority shall fill the offices as so ordained."

We quote from Judge Christiancy as follows: "But when we recur to the history of the country, and consider the nature of our institutions, and of the government provided for by this Constitution, the vital importance which in all the States has so long been attached to local municipal governments by the people of such localities, and their rights of self-government, as well as the general sentiment of hostility to everything in the nature of control by a distant central power in the mere administration of such local affairs, and ask ourselves the question whether it was probably the intention of the convention in framing, or the people in adopting, the Constitution, to vest in the Legislature the appointment of all local officers, or to authorize them to vest it elsewhere than in some of the authorities of such municipalities, and to be exercised without the consent and even in defiance of the wishes of the proper officers, who would be accountable rather to the central power than to the people over whose interests they are to preside—thus depriving the people of such localities of the most essential benefits of self-government enjoyed by other political divisions of the State—when we take all these matters into consideration the conclusion becomes very strong that nothing of this kind could have been intended by the provision. And this conviction becomes stronger when we consider the fact that this Constitution went far in advance of the old one in giving power to the people which had formerly been exercised by the executive, and in vesting or authorizing the Legislature to vest in municipal organizations a further power of local legislation than had before been given to them. We can not, therefore, suppose it was intended to deprive cities and villages of the like benefit of the principle of local self-government enjoyed by other political divisions of the State. The convention must be supposed to have recognized to some extent existing

things, and to have had reference to cities and villages with substantially such organizations or upon such principles of self-government as had generally become customary. And in this view, when they provide that officers in cities and villages should be elected or appointed, we must understand that they referred to appointments of such nature (though not necessarily of the same officers) as had been sometimes, at least, made by the common councils of cities, or by village authorities, as has been quite generally the case with marshals, collectors, city attorneys, treasurers, etc., and such others as the Legislature might see fit to vest in such council or some other local boards, and resting upon similar principles. While, therefore, I have no doubt of the power of the Legislature to abolish or discontinue any of the separate boards previously existing in the city, and consolidate all the powers and duties in this new board, which I think was the main purpose of this act, and to add all the new duties which have been imposed upon them, I concur in the opinions of the chief justice and my brother Cooley that the Legislature had no power to make the appointment of the members of that board, as permanent officers for the full term, or the specific portions of such terms provided by this act for the respective members of the board. And to their full and exhaustive discussion of this point I refer without repeating it."

Judge Cooley, noted as a great constitutional lawyer, and the author of the work on that subject, states the question thus: "Whether local self-government in this State is or is not a mere privilege, conceded by the Legislature in its discretion, and which may be withdrawn at any time at pleasure? I state the question thus broadly because, notwithstanding the able arguments made in this case, and after mature deliberation, I can conceive of no argument in support of the legislative authority which will stop short of this plenary and sovereign right." He then traces the history of township or municipal corporations in some of the American colonies, and shows clearly that these formed the nucleus around which the patriots rallied during the American Revolution, and that they subsequently formed the basis of local self-government in the republic, which neither king nor legislature were permitted to overthrow or destroy." He then proceeds to discuss the question as follows: "In view of these historical facts and of these great principles, the question recurs whether our State Constitution can be so construed as to confer upon the Legislature the power to appoint for the municipalities the officers who are to manage the property, interests, and rights in which their own people alone are concerned. If it can be, it involves these consequences: As there is no provision requiring the legislative interference to be upon any general system, it can and may be partial and purely arbitrary. As there is nothing requiring the persons appointed to be citizens of the locality, they can and may be sent in from abroad, and it is not a remote possibility that self-government of towns may make way for a government by such influences as can force themselves upon the legislative notice at Lansing. As the mu-

nicipal corporation will have no control, except such as the State may voluntarily give it, as regards the taxes to be levied, the buildings to be constructed, the pavements to be laid and the conveniences to be supplied, it is inevitable that parties, from mere personal considerations, shall seek the offices, and endeavor to secure from the appointing body, whose members in general are not to feel the burden, a compensation such as would not be awarded by the people, who must bear it, though the chief tie binding them to the interests of the people governed might be the salaries paid, on the one side, and drawn, on the other. As the Legislature could not be compelled to regard the local political sentiment in their choice, and would in fact be most likely to interfere when that sentiment was adverse to their own, the government of cities might be taken to itself by the party for the time being in power, and municipal governments might easily and naturally become the spoils of party, as State and National offices unfortunately are now. All these things are not only possible, but entirely within the range of probability, if the positions assumed on behalf of the State are tenable. It may be said that these would be mere abuses of power, such as may creep in under any system of constitutional freedom, but what is constitutional freedom? Has the administration of equal laws by magistrates freely chosen no necessary place in it? Constitutional freedom certainly does not consist in exemption from governmental interference in the citizen's private affairs; in his being unmolested in his family, suffered to buy, sell and enjoy property, and generally to seek happiness in his own way. All this might be permitted by the most arbitrary ruler, even though he allowed his subjects no degree of political liberty. The government of an oligarchy may be as just, as regardful of private rights, and as little burdensome as any other; but, if it were sought to establish such a government over our cities by law, it would hardly do to call upon a protesting people to show where in the Constitution the power to establish it was prohibited. It would be necessary, on the other hand, to point out to them where and by what unguarded words the power had been conferred. Some things are too plain to be written. If this charter of State government which we call a 'constitution' were all there was of constitutional command; if the usages, the customs, the maxims that have sprung from the habits of life, modes of thought, methods of trying facts by the neighborhood, and mutual responsibility in neighborhood interests; the precepts which have come from the revolutions which overturned tyrannies; the sentiments of manly independence and self-control which impelled our ancestors to summon the local community to redress local evils, instead of relying upon king or legislature at a distance to do so—if a recognition of all these were to be stricken from the body of our constitutional law, a lifeless skeleton might remain; but the living spirit, that which gives it force and attraction, which makes it valuable and draws to it the affections of the people; that which distinguishes it from the numberless constitutions, so called, which in Europe have been set up and thrown down within

the last hundred years, many of which, in their expressions, have seemed equally fair and to possess equal promise with ours, and have only been wanting in the support and vitality which these alone can give—this living and breathing spirit, which supplies the interpretation of the words of the written charter, would be utterly lost and gone. Mr. Justice Story has well shown that constitutional freedom means something more than liberty permitted. It consists in the civil and political rights which are absolutely guaranteed, assured and guarded; in one's liberties as a man and a citizen; his right to vote; his right to hold office; his right to worship God according to the dictates of his own conscience; his equality with all others who are his fellow citizens—all these guarded and protected, and not held at the mercy and discretion of any one man or of any popular majority. Story, Miscellaneous Writings, 620. If these are not now the absolute rights of the people of Michigan, they may be allowed more liberty of action and more privileges, but they are little nearer to constitutional freedom than Europe was when an imperial city sent out consuls to govern it. The men who framed our institutions have not so understood the facts. With them it has been an axiom that our system was one of checks and balances; that each department of the government was a check upon the others, and each grade of government upon the rest; and they have never questioned or doubted that the corporators in each municipality were exercising their franchises under the protection of certain fundamental principles which no power in the State could override or disregard. The State may mold local institutions according to its views of policy or expediency, but local government is matter of absolute right, and the State can not take it away. It would be the boldest mockery to speak of a city as possessing municipal liberty, where the State not only shaped its government, but, at discretion, sent in its own agents to administer it, or to call that system one of constitutional freedom under which it should be equally admissible to allow the people full control in their local affairs, or no control at all. What I say here is with the utmost respect and deference to the legislative department, even though the task I am called upon to perform is to give reasons why a blow aimed at the foundation of our structure of liberty should be warded off. Nevertheless, when the State reaches out and draws to itself and appropriates the powers which from time immemorial have been locally possessed and exercised, and introduces into its legislation the centralizing ideas of continental Europe, under which despotism, whether of monarch or commune, alone has flourished, we seem forced back upon and compelled to take up and defend the plainest and most primary axioms of free government, as if even in Anglican liberty, which has been gained step by step, through extorted charters and bills of rights, the punishment of kings and the overthrow of dynasties, nothing was settled and nothing established." People v. Hurlbut, 24 Mich., 104-108; 9 Am. Rep., 103.

We might pursue the subject further, and quote from the exhaustive opinion of Judge Hadley in Geake v. Fox, supra, and from the Reports

in other States. But the views quoted, we apprehend, are sufficient, and will serve to indicate the reasoning upon which great judges who have considered this question base their views, and that they regard the attempt on the part of the Legislature to make this innovation, giving the appointing power of municipal officers to the Legislature and Governor, as unwarranted, in the face of our American system of municipal government, and as destructive of the rights of the people in municipalities to select their own officers.

In State ex rel. v. Moores (Neb.), 76 N. W. Rep., 175, 41 Law. Rep. Ann., 624, there was nothing in the Constitution of Nebraska especially restrictive of the authority of the Legislature to make local municipal officers appointive by the Governor, and so the question was here fully and fairly made. The distinguished jurists who wrote that decision were not content to rest the case on what had been said on the subject by other courts, but went into the question again; and, both on principles and authority, it was determined that the appointment and selection of municipal officers by any other than the local authorities was subversive of the principles of local self-government, which belonged to the people of the State, and inheres in every part of the Constitution. A perusal of these opinions is like sounding a new note on the old Liberty Bell, and must inevitably thrill the heart of every patriotic American who loves the free institutions of our country.

Now let us look to our own Constitution on the subject. Bill of Rights, section 1, provides:

"Texas is a free and independent State, subject only to the Constitution of the United States; and the maintenance of our free institutions and the perpetuity of the Union depend upon the preservation of the right of local self-government unimpaired to all the States.

"Sec. 2. All political power is inherent in the people, and all free governments are founded on their authority and instituted for their benefit. The faith of the people of Texas stands pledged to the preservation of a republican form of government," etc.

Article 2 divides the powers of government into three distinct departments—the legislative, executive and judicial—and the powers thereof are reserved to each department, independent of the others. These powers are defined in subsquent articles. Article 6 relates to suffrage. Section 2 thereof prescribes who are suffragans in the State. Section 3 prescribes the voters in towns and cities, and uses this language: "All qualified voters of the State as herein described, who shall have resided for six months immediately preceding an election within the limits of any city or corporate town, shall have the right to vote for mayor and all other elective officers; but in all elections to determine the expenditure of money or assumption of debt, only those shall be qualified to vote who pay taxes on property in said city or incorporated town," etc. Article 11 relates to municipal corporations. Section 4 thereof provides: "Cities and towns having a population of ten thousand inhabitants or less, may be chartered alone by general law," etc. Section 5:

"Cities having more than ten thousand inhabitants may have their charters granted or amended by special act of the Legislature," and then provides for taxation. Section 9 provides that the property of counties, cities and towns, owned and held only for public purposes, such as public buildings, etc., shall be exempt from forced sale and taxation, etc. Section 10 authorizes the Legislature to constitute any city or town a separate and independent school district.

Granting, as was said, that the Legislature is omnipotent unless restrained by some express provision of the Constitution, or some clearly implied restriction, yet it occurs to us that we not only have a strong implied inhibition against the appointment of local municipal officers by the Governor, but our Constitution furnishes express prohibition as against this authority. In State v. McAlister, 88 Texas, 284, it was said that municipal governments had existed before the formation of the Constitution, and the well known and common method of city government was recognized as pre-existent. It was further said "that a purpose to destroy a system of municipal government so common in the State will not be attributed to the convention that framed the Constitution unless the language used is so certain as to compel such a construction by the courts." This, as we have seen, is in consonance with the views expressed by Judge Cooley and other jurists. The fact that a system of municipal government was long in vogue prior to the enactment of the Constitution, and that under this system, from time immemorial, local self-government was recognized, and the power of the suffragans in cities to. elect their own municipal officers was conceded, and that nowhere and at no time had the power ever been claimed on the part of the Legislature to interfere by authorizing the Governor to appoint local municipal officers, must afford strong evidence of an existing condition which would indicate that there was no purpose on the part of those who framed our organic law to destroy a system of municipal government which had always heretofore been recognized. We do not understand that the Constitution grants all power which is not expressly reserved to the legislative body of the government. This is reserved to the people. Only the lawmaking power belongs to the Legislature, and this must be in accordance with the Constitution and with the principles of local self-government reserved to the people of the State, because the Constitution says that all political power is inherent in the people, not in the Legislature, and the right of local self-government is reserved to the State. Local self-government is not the mere whim and caprice of the legislative department, nor does it appertain to any distinctive locality of the State, but to the whole State, and as it had aforetime existed in the State. The principle of local self-government is applicable to every organized portion of the State; and if in the history and traditions of our commonwealth, as well as that of other States, municipalities always exercised the right to select their own local municipal officers, then it would seem to follow that this was a part of the local self-government which remains unimpaired to the

State.   The Legislature is the lawmaking power, and to it alone is referred the authority to make laws; but it has no right, under the guise of its lawmaking authority, to overturn the principles of local self-government which have been handed down to us from our fathers. Nor will it be conceded that the right to make laws on the part of the Legislature carries with it the right to appoint to office, either by themselves or through an agent.   They undoubtedly have the right to create offices and prescribe their duties, but here their lawmaking functions cease, and the filling of the offices belong to the locality.   As was said by Judge Hadley in Geake v. Fox, supra:  "To thus deprive the people of a locality of the right to choose their own immediate officers is to rob them of their freedom, and to defeat one of the great ends for which the government was established."

However, it is not necessary to rest this decision upon implication, as, in our opinion, the Constitution expressly prohibited the Legislature to either appoint directly, or through the Governor, the local municipal officers of cities and towns, inasmuch as the Constitution expressly confers the power on the citizen voters of the municipality "to elect the mayor and other elective officers."   It is said that the article in question is merely to define the right of suffrage in cities.   By this it would appear to be conceded that, if the suffrage section relating to cities had occurred in article 11, instead of article 6, there would be no question but that the office of mayor, at least, should be elective; that is, the contention is, because this particular clause of the Constitution does not occur under the head of municipal corporations, it has not the same meaning as if it occurred there.   We can not agree with this contention.   We believe if the clause confers the right on the voter in cities to vote for the mayor and other elective officers, it is effective, no matter where it may have been placed by the Constitution builders.   The language of said provision is not dubious.   It is clear and unequivocal. The terms used are strong.   The language is that the suffragan "shall have the right to vote for mayor and other elective officers."   If this right is conferred, by what power can the Legislature deny it?   If they can not do it directly, can they accomplish it by indirection?   To hold that the Constitution makers undertook the task of defining qualifications of voters in cities, and providing that persons possessing the enumerated qualifications should have the right to vote for mayor and other elective officers, and then to decide without any express provision of the Constitution on the subject, that the Legislature should have the power to withhold this right to vote in cities, would, in our opinion, be a travesty on constitutional construction.   Certainly, after the right to vote had been conferred, it would be a strange doctrine that the Legislature, without some constitutional warrant, would be authorized to limit or deny the right of suffragans to vote in cities.

It is insisted that the Legislature are potential in the matter of granting charters to cities; they may grant a charter, or abolish it at pleasure.   However, it does not follow that they can grant any sort of

a charter, but only that character of charter which under our system of government pertains to towns and cities. They can not refuse to create the office of mayor or the board of aldermen. People v. Detroit, 29 Mich., 108. And so, if in creating a municipal corporation the Legislature is constrained to create the office of mayor, this office must be elective, because the Legislature can not withhold from the municipal voter the right to vote for mayor, inasmuch as the Constitution confers this right; and it also confers the right upon the suffragans of the municipality to vote for other elective officers. What other elective officers? Evidently those that aforetime the voters in the municipality had been accustomed to select at the ballot box.

But if it be conceded that "other elective officers" means only such as the Legislature may make elective, it would by no means follow that the ordinance in question was a valid ordinance, as is insisted by the respondent here, for we must confess we are not able to exercise that subtilty of distinction which differentiates between the office of mayor in his executive and legislative capacity. The charter itself gives the mayor not merely the right to vote where there is a tie, but the right to vote on all occasions, and as it is impossible to determine whether or not there was a tie in the passage of this ordinance, and that the mayor by his vote cut the Gordian knot of legislation by voting for it, we can not ascertain whether the ordinance was passed by a constitutional vote; that is, by one who had the constitutional right to vote for the ordinance. We think it follows, unquestionably, if the president of the board of commissioners did not have the right to vote on said ordinance, that said ordinance is tainted, and in consequence is null and void. However, we would not be understood as intimating that the board of aldermen, not being named in the Constitution as elective officers, might be appointive, for, as stated, in all of our municipalities these officers had always been elected by the suffragans in the municipal locality, and the expression in the Constitution was but a recognition of existing conditions, and was passed with reference to the status of municipalities theretofore in vogue. Moreover, if we had need of contemporaneous construction as to the elective character of these officers—mayor and board of aldermen—we have but to refer to the incorporation of cities and towns in the general act of 1875 (Laws 1875, p. 113, chap. 100), and acts subsequent thereto, as evidence of the fact that the Legislature itself regarded these offices as elective, inasmuch as they created them so under the Constitution. We hold that the mayor and board of aldermen of said city were elective officers under and by virtue of our Constitution, and that the majority of these, in the face of our traditions and of the organic law itself, having been appointed by the Governor, any law or ordinance passed by them was without authority, inasmuch as they were not officers of the municipality, and could not, under our Constitution, be such.

In what has been said, we have refrained from any expression of criticism of either the Legislature or the Governor. Undoubtedly, as

is urged by counsel for respondent, they believed that a great emergency had arisen, with which ordinary methods were unable to cope. However, we believe, if the remedy adopted is to stand as a precedent, it would be productive of more serious ills than those which were attempted to be overcome by this species of legislation. A great writer has said that "we had better bear the ills we have than fly to those we know not of." And this is true in governments, and perhaps more so than any other of the affairs of life. It may be that here and there, under our American system, cities may be given over to corruption, and lawless elements permitted to run riot over the best interests of the municipality, but this can only be temporary. If we adhere rigidly to the principles of local self-government, in the end conservatism and enlightenment and American citizenship will triumph. But if this incentive on the part of the better classes for good government is removed, and localities taught to depend on some central power to take care of them, we may never expect an improvement. On the contrary the seeds of our free institutions, planted by the fathers in the townships and municipalities, will be scattered to the winds, anarchy will run riot throughout the entire body politic, while we look in vain for some strong central power to arrest the destruction of our liberties which have rested hitherto upon that vital and essential principle of the Republic—local self-government by the people.

The judgment is reversed and appellant ordered discharged.

*Reversed and appellant discharged.*

BROOKS, JUDGE (Dissenting).—At the recent Dallas term the opinion of the majority of the court was delivered, and I dissented therefrom, using the following language: "I do not believe that either the letter or the spirit of the Constitution authorizes the opinion of the majority of the court. Charters of cities of over ten thousand inhabitants are within the sound discretion of the Legislature. All municipal charters are mere creatures of the Legislature, and there is no limitation in the Constitution upon the power of the Legislature to create municipal charters; hence I can not hold that there are some things so plainly unconstitutional that they need not be written therein. If I deem it necessary, I will write my views on this question later." And I proceed now to do so.

The Legislature of Texas granted a special charter to the city of Galveston, one provision of which was that said city should have five commissioners, whose duties should be practically the same as aldermen, three of whom were to be appointed by the Governor; and one of the three being designated by him as president of the board of commissioners, having the rights, duties and privileges of mayor. The majority opinion holds that, the people of the city of Galveston having innate and inherent right of local self-government, the act is unconstitutional, and also that the Constitution contains express provision inhibiting the Legislature from passing a law authorizing the Governor

to appoint any part of the officers of the city. I shall proceed to discuss the first proposition, and then the second.

As to whether it is good policy for a State, through its Legislature, to appoint the respective officers to govern a city, through an appointment by the Governor under the act of the Legislature, or whether this right should be contained in the charter, and the people alone elect said officers, is a proposition purely political, with which courts have nothing to do. If there is nothing in the Constitution placing a limitation on the power of the Legislature in this respect, the act is constitutional. Speaking in reference to the policy of statutes as to whether or not such statutes are constitutional, Judge Cooley uses this language: "Nor can a court declare a statute unconstitutional and void solely on the ground of unjust and oppressive provisions, or because it is supposed to violate the natural, social, or political rights of the citizen, unless it can be shown that such injustice is prohibited or such rights guaranteed or protected by the Constitution. It is true, there are some reported cases in which judges have been understood to intimate a doctrine different from what is here asserted; but it will generally be found, on an examination of those cases, that what is said is rather by way of argument and illustration, to show the unreasonableness of putting upon constitutions such a construction as would permit legislation of the objectionable character then in question, and to induce a more cautious and patient examination of the statute with a view to discover in it, if possible, some more just and reasonable legislative intent, than as laying down a rule by which courts would be at liberty to limit, according to their own judgment and sense of justice and propriety, the extent of legislative power in directions in which the Constitution had imposed no restraint." Cooley's Const. Lim., p. 197. "If the Legislature should pass a law, in plain and unequivocal language, within the general scope of their constitutional powers, I know of no authority in this government to pronounce such an act void, merely because, in the opinion of the judicial tribunals, it was contrary to the principles of natural justice; for this would be vesting in the court a latitudinarian authority which might be abused, and would necessarily lead to collisions between the legislative and judicial departments, dangerous to the well-being of society, or at least not in harmony with the structure of our ideas of natural government." Per Rogers, J., in Commonwealth v. McCloskey, 2 Rawle, 374. "All the courts can do with odious statutes is to chasten their hardness by construction. Such is the imperfection of the best human institution, that, mold them as we may, a large discretion must at last be reposed somewhere. The best and in many cases the only security is in the wisdom and integrity of public servants, and their identity with the people. Governments can not be administered without committing powers in trust and confidence." Beebe v. State, 6 Ind., 501, 528, 63 Am. Dec., 391, per Stuart, J.; citing Steamboat Co. v. Foster, 5 Ga., 194, 48 Am. Dec., 248; State v. Kruttschnitt, 4 Nev., 178; Walker v. Cincinnati,

21 Ohio St., 14, 8 Am. Rep., 24. "The rule of law upon this subject appears to be that, except where the Constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operate according to natural justice or not in any particular case. The courts are not the guardians of the rights of the people of the State, except as those rights are secured by some constitutional provision which comes within the judicial cognizance. The protection against unwise or oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil, but courts can not assume their rights." Cooley's Const. Lim., p. 200. And on page 206, Id., it is said: "It is to be borne in mind, however, that there is a broad difference between the Constitution of the United States and the Constitutions of the States, as regards the powers which may be exercised under them. The government of the United States is one of enumerated powers. The governments of the States are possessed of all the general powers of legislation. When a law of Congress is assailed as void, we look in the national Constitution to see if the grant of specified powers is broad enough to embrace it; but, when a State law is attacked on the same ground, it is presumably valid in any case, and this presumption is a conclusive one, unless in the Constitution of the United States or of the State we are able to discover that it is prohibited. We look in the Constitution of the United States for grants of legislative power, but in the Constitution of the State to ascertain if any limitations have been imposed upon the complete power with which the legislative department of the State was vested in its creation. Congress can pass no laws but such as the Constitution authorizes either expressly or by clear implication, while the State Legislature has jurisdiction of all subjects on which its legislation is not prohibited. 'The lawmaking power of the State,' it is said in one case, 'recognizes no restraints, and is bound by none, except such as are imposed by the Constitution.' That instrument has been aptly termed a legislative act by the people themselves in their sovereign capacity, and is therefore the paramount law. Its object is not to grant legislative power, but to confine and restrain it. Without the constitutional limitations, the power to make laws would be absolute." Cooley's Const. Lim., p. 206. If a State Constitution is an instrument of limitations upon the power of the Legislature, and the Federal Constitution is an instrument of delegated power, as stated, then it follows from the above quotation that the Legislature can create a municipal charter with such clauses, conditions, and provisions as they see fit, provided said Constitution contains no direct inhibition, or some clause of the Federal Constitution is not violated.

The opinion of the majority is predicated in the main upon the case of People v. Hurlbut, 24 Mich., 44, 9 Am. Rep., 103, and about ten pages of the opinion is practically a copy of the opinions of the several judges who wrote in said case, and it is so stated by the majority.

However, a careful reading of said opinions in the Hurlbut case will show that they were not attempting to decide the act unconstitutional on the ground that the people had an inherent right of local self-government, but, as Judge Cooley indicates in the above extract, the learned judges were merely fortifying their conclusions that a direct express constitutional provision in the Michigan Constitution inhibited the appointment of local officers for cities; and said case was decided on the bare proposition that the Constitution did prohibit the appointment of officers for a city. While it is true they go further in said opinions, and hold that peace officers might be appointed by the Governor, under authority of the Legislature, to act within said city, on the theory that peace officers were preservators of the peace of the city, still in the opinion of Judge Cooley we find this language: "But I think that, so far as is important to a decision of the case before us, there is an express recognition of the right of local authority by the Constitution. That instrument provides (art. 15, sec. 14) that 'judicial officers of cities and villages shall be elected; and all other officers shall be elected or appointed, at such time and in such manner as the Legislature may direct.' " And then he deduces a very logical conclusion from said provision that the Constitution of the State of Michigan expressly inhibits the appointment of the officers under consideration. So, clearly, the case of People v. Hurlbut, supra, can not be justly regarded as authority for the opinion of the majority. To show that the learned writer of said opinion did not mean to uphold the opinion of the majority, I will quote from his work an Constitutional Limitations, as follows: "The creation of municipal corporations, and the conferring upon them of certain powers and subjecting them to corresponding duties, does not deprive the Legislature of the State of that general control over citizens which was before possessed. It still has authority to amend their charters, enlarge or diminish their powers, extend or limit their boundaries, consolidate two or more into one, overrule their legislative action whenever it is deemed unwise, impolitic, or unjust, and even abolish them altogether, in the legislative discretion, and substitute those which are different. The rights and franchises of such a corporation, being granted for the purpose of government, can never become such vested rights, as against the State, that they can not be taken away; nor does the charter constitute a contract, in the sense of the constitutional provision which prohibits the obligation of contracts being violated. Restraints on the legislative power of control must be found in the Constitution of the State, or they must rest alone in the legislative discretion." P. 228. "Nevertheless, as the corporators have a special and peculiar interest in the terms and conditions of the charter, in the powers conferred and liabilities imposed, as well as in the general question whether they shall originally be or afterwards remain incorporated at all or not, and as the burdens of municipal government must rest upon their shoulders, and especially as by becom-

45 Crim.—3.

ing incorporated they are held, in law, to undertake to discharge the duties the charter imposes, it seems eminently proper that their voice should be heard on the question of their incorporation, and that their decisions should be conclusive, unless, for strong reasons· of State policy or local necessity, it should seem important for the State to overrule the opinion of the local majority." P. 139. So I take it that the opinion of the majority of the court is without support in the Hurlbut case, and is in direct conflict with every clause of Judge Cooley's work on Constitutional Limitations.

A municipal charter is a bare creature of the Legislature, and the Legislature can make, abrogate or amend the same as it deems proper. Being a creature of the Legislature the question of local self-government does not enter into, nor can it be considered in passing on, the constitutional right of the Legislature to grant the charter. For, as stated, it can incorporate a city without its consent, place upon it such obligations as the Legislature sees fit, and these obligations can be carried out by any agencies the Legislature prescribes.

The majority opinion of the court contains this language: "In State ex rel. v. Moores (Neb.), 76 N. W. Rep., 175, 41 Law. Rep. Ann., 624, there was nothing in the Constitution of Nebraska especially restrictive of the authority of the Legislature to make local municipal officers appointive by the Governor, and so the question was here fully and fairly made. The distinguished jurists who wrote that decision were not content to rest the case on what had been said on the subject by other courts, but went into the question again; and, both on principles and authority, it was determined that the appointment and selection of municipal officers by any other than the local authorities was subversive of the principle of local self-government, which belonged to the people of the State, and inheres in every part of the Constitution. A perusal of· these opinions is like sounding a new note on the old Liberty Bell, and must inevitably thrill the heart of every patriotic American who loves the free institutions of our country." But, unfortunately for the opinion of the majority, the note was fearfully discordant, and so utterly at variance with all constitutional rules of construction that the same court which rendered the opinion expressly overruled the same in Redell v. Moores, 88 N. W. Rep., 243, 55 Law. Rep. Ann., 740 (decided in 1901), where the following language was used: "But in view of those rules we have been led to re-examine the majority opinion in State ex rel. v. Moores, 55 Neb., 480, 76 N. W. Rep., 175, 41 Law. Rep. Ann., 624, which up to this point we have assumed to be the final expressions of this court on the questions therein involved. After a careful examination of that opinion, and with due appreciation of the learning and ability of the members of the court who concur therein, we beg to say it does not commend itself to our judgment. It holds that the provisions of the statute placing the power to appoint members of the board of fire and police commissioners in the hands of the Governor are invalid, not because it is in conflict with any express provision of the State or Federal Constitution, but

because it is repugnant to the inherent right of local self-government, which, it is claimed, was retained by the people at the time of the adoption of the organic law. So far as the individual members of society are concerned, in the nature of things, there can be no such thing as an inherent right of local self-government. The right of local self-government is purely a political right, and all political rights, of necessity, have their foundation in human government. For an individual to predicate an inherent right—a right inborn and inbred—on a foundation of human origin, involves a contradiction of terms. So far as a city is concerned, considered in the character of an artificial being, it is a creature of the Legislature. It can have no rights save those bestowed upon it by its creator. As it might have been created lacking some right bestowed upon it, it is in no position to complain should the power that bestowed such right see fit to take it away. In other words, the power to create implies the power to impose upon the creature such limitations as the creator may will, and to modify or even destroy what has been created. The power to create a municipal corporation which is vested in the Legislature implies the power to create it with such limitations as the Legislature may see fit to impose, and to impose such limitations at any stage of its existence. That such power may not always be exercised most wisely is among the possibilities, but that does not warrant this court in wresting it from the hands to which the people, by the fundamental law of the State, have confided it. We shall not attempt to review the authorities bearing on this question. The majority opinion leaves nothing to be said on one side, while the minority opinion is equally exhaustive on the other. To those opinions we must refer the court. The majority opinion, to our minds, introduces a new principle in our system of jurisprudence, and one pregnant with mischievous consequences. We have been taught to regard the State and Federal Constitutions as the sole tests by which the validity of the acts of the Legislature are to be determined. If the majority opinion in that case is to stand as the settled law of the State, then, in addition to such tests, there is another—an elusive something, elastic and uncertain as an unwritten constitution, which may be invoked to defeat the legislative will. We can not believe that such principle should receive the final sanction of this court. The case of Newport v. Horton, 22 R. I., 196, 47 Atl. Rep., 312, 50 Law. Rep. Ann., 330, adds strength to our convictions on this point. In that case, after a critical review of the authorities, the court arrives at the conclusion that the case of State ex rel. v. Moores, 55 Neb., 480, 76 N. W. Rep., 175, 41 Law. Rep. Ann., 624, is unsupported by a single authority." If, as stated, it is true that the case of State v. Moores, supra, "is unsupported by a single authority"—and, after a most searching investigation, I have been unable to find any authority supporting the opinion of the majority opinion of this court—then the opinion of the majority in this case is the only authority extant to-day supporting the position that the unwritten law of the land gives muncipal corporations the right of self-government. Sullivan, J., concurring in the over-

ruling of State v. Moores, supra, and State ex rel. Smyth v. Kennedy, 60 Neb., 300, 83 N. W. Rep., 87, which followed the former, in the case of Redell v. Moores, supra, uses this language: "I said with respect to the decision in the Moores case: 'The Moores case lays down the doctrine that whatever the court may conceive to be the spirit of the Constitution is to be regarded as part of the paramount law. While the decision, by recognizing and enforcing the asserted right of local self-government, is conceded to rest upon a sound political principle, it was rendered by a divided bench, and, as a judicial pronouncement, has been much criticised. If it is to be acquiesced in and accepted as a rule of construction, the Constitution of the State is to be fully known only by studying the theory of the judges who are chosen to expound it. It will expand or contract with every fluctuation of the popular will which produces a change in the personnel of the court, and the limitations upon legislative power will be as unknown and unknowable as were the rules of equity in the days when the chancellor's conscience was the law of the land. It is the opinion of the writer that the decision is thoroughly vicious; that it strikes a lethal blow at a co-ordinate branch of the government, and ought to be repudiated and condemned.' Still entertaining these views— still believing that all the governmental powers of municipal corporations come from the Legislature, and are to be found only in living statutes—I could not, of course, do otherwise than give my approval to the conclusion reached by the department." In Newport v. Horton, 22 R. I., 196, 47 Atl. Rep., 312, 50 Law Rep. Ann., 337, the following language is used: "The Supreme Court of Michigan has been specially favored with this class of cases. In People ex rel. Drake v. Mahaney, 13 Mich., 481, an act constituting certain persons a police commission for the city of Detroit, embracing the powers conferred in the act before us with others much more extensive, was held to be constitutional. After considering objections not applicable to this case, Judge Cooley took up the objection to the act 'on general principles, and especially because violating fundamental principles of our system, that governments exist by the consent of the governed, and that taxation and representation go together.' The court held that the objection was answered by the representation of the people of Detroit in the Legislature which passed the act, and in the election of the Governor who appointed the board. Judge Cooley said: 'There is nothing in the maxim that taxation and representation go together, which requires that the body paying the tax shall alone be consulted in its assessment; and, if there were, we should find it violated at every turn in our system. The State Legislature not only has a control in this respect over inferior municipalities, which it exercises by general laws, but it sometimes finds it necessary to interpose its power in special cases to prevent unjust or burdensome taxation, as well as to compel the performance of a clear duty.'" And the opinion proceeds, after reviewing the cases of People v. Hurlbut, 24 Mich., 44, 9 Am. Rep., 103; People ex rel. Park Com'rs v. Detroit, 28 Mich., 228, 15 Am. Rep., 202; People ex rel. v. Draper, 15 N. Y., 532; People ex

rel. v. Porter, 90 N. Y., 68; Rathbone v. Wirth, 150 N. Y., 459, 45 N. E. Rep., 15, 34 Law. Rep. Ann., 408; People v. Lynch, 51 Cal., 15, 21 Am. Rep., 677; State ex rel. v. Moores, 55 Neb., 480, 76 N. W. Rep., 175, 41 Law. Rep. Ann., 624; and Smyth v. Kennedy (Neb.), 83 N. W. Rep., 87: "These include all the cases relied on by the petitioners in support of the principle that an act of the Legislature establishing a police commission for a city takes away its right of self government implied in the Constitution. In all of them there have been very vigorous and cogent arguments in favor of the protection of that right, with which, in the main, we do not disagree. But it is evident from the points decided that, excepting in Nebraska, they have all involved a purely municipal office, or have turned upon some express prohibition in the Constitution. With the exception stated, not one has denied the general power of the Legislature to assume the control of the local police. In the cases cited, Michigan has affirmed the power. Nebraska has denied it. The uniform decisions in other States, so far as they have come to our notice, have sustained the power." Citing many cases authorizing the Governor to remove a member of the fire and police board, and concluding with this language: "The clear weight of authority sustains the right of the Legislature to control police, and equally is it sustained by sound reason."

If the Legislature can appoint a police board without the will, wish or knowledge of the municipal government, it can appoint any or all of the officers. It is true, a great many of the authorities proceed on the idea that the police are quasi State officers, or, rather, they enforce State laws as well as local municipal laws. The same can be said of the mayor of the city and of the city council, in that in many, if not most, instances they re-enact the State laws by passing ordinances punishing persons for offenses inhibited by State law, and to that extent they are making laws for the State, and the mayor is called upon to enforce the laws of the State. I dare say that in the police court to-morrow 90 per cent of the defendants before said court will be under a charge of violating State laws within the municipality. And no sound reason, public policy or decision of any court can ever justify a distinction between the right to appoint the police and the right to appoint any other officer in the city. See, also, Americus v. Perry (Ga.), 40 S. E. Rep., 230, 57 Law. Rep. Ann., 230, decided in 1902.

In People v. Pinckney, 32 N. Y., 377, the court said: " 'The Legislature,' said Denio, J., in Darlington v. Mayor (MS. Op.), 'have plenary power in respect to all subjects of civil government which they are not prohibited from exercising by the Constitution of the United States, or by some provision or arrangement of the Constitution of the State.' And he condenses with approbation the views expressed by Justice Washington in Dartmouth College v. Woodward, 4 Wheat., 518, 4 L. Ed., 629: 'That there were two kinds of corporations aggregate, viz., such as were for public government, and others of a private character. The first are those for the government of towns and cities, or the like, and, being for public advantage, are to be governed according to the

laws of the land. That these were mere creatures of a public institution, created exclusively for public advantage. That it would seem reasonable that such a corporation may be controlled, and its constitution altered and amended, by the government in such manner as the public interest may require. That such legislative interference can not be said to impair the charter by which the corporation was formed, because there is in reality but one party to it; the trustees or governors of the corporation being merely the trustees for the public, the cestui que trust of the corporation. * * * In People v. Morris, 13 Wend., 325, the Supreme Court held: "* * * It is an unsound and even absurd proposition,' says Nelson, J., in an opinion of signal ability, 'that political power conferred by the Legislature can become a vested right, as against the government, in an individual or body of men. It is repugnant to the genius of our institutions and the spirit and meaning of the Constitution, for by that fundamental law all political rights not there defined and taken out of the exercise of legislative discretion were intended to be left subject to its regulation.' " In Barnes v. Dist. of Columbia, 91 U. S., 540, 23 L. Ed., 440, Justice Hunt, delivering the opinion of the court, said: "An elected mayor or an appointed mayor derives his authority to act from the same source, to wit, that of the Legislature. The whole municipal authority emanates from the Legislature. Its legislative charter indicates its extent, and regulates the distribution of its powers, as well as the manner of selecting and compensating its agents. The judges of the Supreme Court of a State may be appointed by the Governor, with the consent of the senate, or they may be elected by the people. But the powers and duties of the judges are not affected by the manner of their selection. The mayor of a city may be elected by the people, or he may be appointed by the Governor with the consent of the senate; but the slightest reflection will show that the powers of this officer, his position as the chief agent and representative of the city, are the same under either mode of appointment. Whether his act in a case in question is the act of and binding on the city depends upon his powers under the charter to act for the city, and whether he has acted in pursuance of them, not at all upon the manner of his election." It may be said, however, that this case is not analogous to the question under consideration, in that the mayor in the District of Columbia was appointed by the Federal government. But if any locality in the United States has an innate and inherent right of local self-government, then the mere fact that it is a political subdivision of the United States, as contradistinguished from the States, would not change the inherent right of local self-government. In Commonwealth, etc., v. Lucas, 93 U. S., 114, 23 L. Ed., 822, this language is used: "But between the State and municipal corporations, such as cities, counties, and towns, the relation is different from that between the State and the individual. Municipal corporations are mere instrumentalities of the State, for the convenient administration of government; and their powers may be qualified, enlarged, or with-

drawn at the pleasure of the Legislature. Their tenure of property, derived from the State for specific public purposes, or obtained for such purposes through means which the State alone can authorize— that is, taxation—is so far subject to the control of the Legislature that the property may be applied to other public uses of the municipality than those originally designated. This follows from the nature of such bodies, and the dependent character of their existence." In Commonwealth v. Plaisted, 148 Mass., 375, 19 N. E. Rep., 224, 2 Law. Rep. Ann., 142, 12 Am. St. Rep., 566, Morton, C. J., says: "There can be no doubt that the power to create, change, and destroy municipal corporations is in the Legislature. This power has been so long and so frequently exercised upon counties, towns, and school districts, in dividing them, altering their boundary lines, increasing and diminishing their powers, and in abolishing some of them, that no authorities need be cited on this point. The Constitution does not establish these corporations, but vests in the Legislature a general jurisdiction over the subject by its grant of power to make wholesome laws, as it shall judge to be for the general good and welfare of the commonwealth. It 'may amend their charters, enlarge or diminish their powers, extend or limit their boundaries, consolidate two or more into one, and abolish them altogether, at its own discretion.' Weymouth & Braintree Fire Dist. v. County Com., 108 Mass., 142. The several towns and cities are agencies of government largely under the control of the Legislature. The powers and duties of all towns and cities, except so far as they are specially provided for in the Constitution, are created and defined by the Legislature; and we have no doubt that it has the right, in its discretion, to change the powers and duties created by itself, and to vest such powers and duties in officers appointed by the Governor, if, in its judgment, the public good requires this, instead of leaving such officers to be elected by the people or appointed by the municipal authorities."

This excerpt appears to settle this question, but, in deference to the opinion of the majority of the court, I will review other authorities: In Philadelphia v. Fox, 64 Pa., 169, Justice Sharswood, delivering the opinion, says: "The sovereign may continue its corporate existence, and yet assume or resume the appointments of all its officers and agents into its own hands, for the power which can create and destroy can modify and change. Indeed, the Legislature of this commonwealth, under the Constitution, could not by contract invest any municipal corporation with an irrevocable franchise of government over any part of its territory. It can not alienate any part of the legislative power which by the Constitution is vested in a General Assembly annually convened. * * * If the Legislature were to attempt to erect a municipality with a special provision that its charter should be unchangeable or irrevocable, such provision would be a nullity, for acts of Parliament derogatory from the power of subsequent parliaments bind not. 1 Blacks. Com., 90. That such political institutions have not, and can not have, any vested rights as against the State, is strikingly illustrated and exemplified in the

Borough of Dunmore's appeal, 52 Pa., 374, where it was held by this court that municipal corporations, being creatures of legislation, have no constitutional guaranty of trial by jury, and such trial may be denied them." "A public corporation is one that is created for political purposes, with political powers to be exercised for purposes connected with the public good in the administration of civil government—an instrument of the government subject to the control of the Legislature, and its members, officers of the government for the administration of the public good. Regents' case, 9 Gill & J., 365, 397, 401, 31 Am. Dec., 72, and in the same case it is said, 'Public corporations are to be governed according to the laws of the land, and the government has the sole right, as trustee of the public interest, to inspect, regulate, control, and direct the corporation, its funds and franchises. That is of the essence of a public corporation.'" Pumphrey v. Mayor, etc., of Baltimore, 47 Md., 145, 28 Am. Rep., 446. In Burckholter v. McConnellsville, 20 Ohio St., 308, it said: "Morality and good order, the public convenience and welfare, may require many regulations in crowded cities and towns which the more sparsely settled portions of the country would find unnecessary. And it is for legislative discretion to determine, within the limitations of the Constitution, to what extent city or town councils shall be invested with the power of local legislation." Where a charter of a city "provides for the appointment of officers connected with the constabulary of the State, there is no invasion of the right of local self-government, but simply the exercise of the power to provide for the selection of peace officers of the State." State ex rel. v. Kolsem, 130 Ind., 434, 29 N. E. Rep., 595, 14 Law. Rep. Ann., 566. If the city, as indicated above, has no right of local self-government that precludes the Legislature, through the Governor, appointing police, as this authority holds, then, it follows as a legal sequence which can not be successfully combated, that the Governor can appoint all the officers to govern a city. A municipal corporation is a creature of legislation, and its modes of government, and the officers conducting the same, may be changed by the Legislature. By an act of the Legislature of the State of Georgia, county commissioners were appointed to govern a county in which was located the town of Darien, and one of the duties put upon said commissioners was the exercise of corporate authority of such town. The court, in Churchill v. Walker, 68 Ga., 681, held said act was entirely constitutional, since, as stated, the municipal corporation is the bare creature of the Legislature, and they can provide such officers for it as they see fit. The power of the Legislature over municipal corporations, in the absence of constitutional restrictions, is unlimited, except so far as they are invested with rights incident to a private corporation. Public parks, the supply of gas, water and sewerage in towns and cities, may ordinarily be classed as private objects; but they often become matters of public importance, and whether they are the one or the other is a fact which may be decided by the Legislature. And in considering an act to supply the city of Portland with water, the court may take judicial

notice of the fact that said city is the metropolis of the State, having important commercial and business relations with all its citizens, and that the entire community have, therefore, a direct interest in the city's welfare." David v. Portland Water Co., 14 Ore., 98, 12 Pac. Rep., 174. In this case the court upholds unqualifiedly the legislative right of absolute supervision and appointment of officers of a city whenever the Legislature may deem it necessary, and it is for the Legislature alone to decide when it is necessary. To support this position, an array of authority is cited in 14 Ore., 101, 12 Pac. Rep., 174, covering the page. In Meriwether v. Garrett, 102 U. S., 511, 26 L. Ed., 197, the court uses this language: "The right of the State to repeal the charter of Memphis can not be questioned. Municipal corporations are mere instrumentalities of the State for the more convenient administration of local government. Their powers are such as the Legislature may confer, and these may be enlarged, abridged or entirely withdrawn at its pleasure. This is common learning, found in all adjudications on the subject of municipal bodies, and repeated by text-writers. There is no contract between the State and the public that the charter of a city shall not be at all times subject to legislative control. All persons who deal with such bodies are conclusively presumed to act upon knowledge of the power of the Legislature. There is no such thing as a vested right held by any individual in the grant of legislative power to them. * * * By the repeal the legislative powers previously possessed by the corporation of Memphis reverted to the State. A portion of them the State immediately vested in the new government of the taxing district, with many restrictions on the creation of indebtedness. A portion of them the State retained. It reserved to the Legislature all power of taxation. It thus provided against future claims from the improvidence or recklessness of the new government. The power of the State to make this change of local government is incontrovertible. Its subsequent provision for the collection of the taxes of the corporation levied before the repeal of its charter, and the appropriation of the proceeds to the payment of its debts, remove from the measure any imputation that it was designed to enable the city to escape from its just liabilities."

This last cited authority merely fortifies the long array of authorities cited above, and adds additional force, in that the city of Memphis, by improvidence and mismanagement, had become so seriously involved in debt that some economic administration of its government was necessary in order to prevent the city from becoming helplessly bankrupt. The Legislature of the State of Tennessee, in order to meet this exigency and unfortunate condition, repealed the charter of Memphis, and provided for it what was denominated the Shelby County Taxing District; and in said act provided, as the quotation indicates, for its control, management and direction. The Supreme Court of the United States upholds this right. And it can be added with peculiar and pathetic force that the stricken city of Galveston had been previously mismanaged to such an extent that its revenues had been squandered and improvidently

expended; and the Legislature of the State of Texas, with full understanding and sympathy with the stricken city, a few months before inflicted with a storm and cyclone that nearly decimated it, passed the charter in question, placing, as the Legislature thought, the government of Galveston upon a safer and more economic basis. Whether or not they acted wisely is not for us to decide. They had the legal and constitutional right to decide. With the policy of laws we have nothing to do. With the injustice of law we have no complaint to make, unless there is some constitutional inhibition, some direct clause, either expressed or by implication, that necessarily makes the act of the Legislature unconstitutional; and in this instance its acts are both humane, just, legal and constitutional.

In the view I have taken up to this time, I have proceeded upon the assumption that there is nothing in the Constitution against this character of legislation. But my brethren in the majority opinion insist that there is, and, to sustain them, cite certain clauses of the State Constitution. The first provision relied upon by the majority is section 1 of the Bill of Rights. In order that we may have a comprehensive conception of said provision, I quote it in its entirety: "Texas is a free and independent State, subject only to the Constitution of the United States; and the maintenance of our free institutions and the perpetuity of the Union depend upon the preservation of the right of local self-government unimpaired to all the States." It will be noted that this provision only attempts to lay down the proposition that the right of local self-government remains unimpaired to all the States— not unimpaired to all the "State," not unimpaired to all the counties, precincts and cities, but the right of local self-government remains unimpaired to all of the "States" as contradistinguished from the Federal government. In other words, the Federal government can not interfere with the local management of State affairs, or, to put it differently, they can not interfere with any governmental agency of the State, or any government of the State, unless such government in some respect infringes some constitutional provision of the Federal government. There is no thought in this clause of the Constitution guaranteeing to a municipality—a mere creature of the Legislature—the right of local self-government. The next clause cited is section 3 of article 6, entitled "Suffrage," which reads as follows: "All qualified electors of the State, as herein described, who shall have resided for six months immediately preceding an election within the limits of any city or corporate town, shall have the right to vote for mayor and all other elective officers; but in all elections to determine expenditure of money or assumption of debt, only those shall be qualified to vote who pay taxes on property in said city or incorporated town: provided that no poll tax for payment of debts thus incurred shall be levied upon the persons debarred from voting in relation thereto." It will be seen from a perusal of this section that the Constitution builders had but one purpose in view, to wit, to define the qualifications of electors. If one has

a constitutional right to vote for "mayor and all other elective officers," then what becomes of this constitutional right, when the Legislature abrogates the charter, as all writers on constitutional law concede it has the right to do? And even the construction insisted upon by the majority could not possibly apply to the latter clause of this section, for if this clause makes it absolutely necessary to elect the mayor, it does not guaranty to the elector the right to vote for other officers, but merely says he has the right to vote for all other elective officers. If they are not elective, he certainly can not have the right to vote for them under this clause. But it is a strained construction, utterly at variance to the subject under consideration, to say that the mere fact that the Constitution says, "who shall have the right to vote for mayor and all other elective officers," makes the mayor necessarily elective. Under the previous clauses in the same article, he has the right to vote for officers in the State, but must all these officers be elective? Certainly not. In article 11, entitled "Municipal Corporations," section 4 provides that "cities and towns having a population of ten thousand inhabitants or less, may be chartered alone by general law." And then follows a limitation upon their taxing power. Section 5 provides: "Cities having more than ten thousand inhabitants may have their charter granted or amended by special act of the Legislature." And then follows a limitation upon their taxing power, different from section 4. There is nothing in article 11 providing who the officers of a city should be. If the Constitution intended that the officers of a city should be elected by the citizens of the cities, certainly there would have been some provision, under the head of "Municipal Corporations," from which such construction or conclusion could have been reached. But there is a total absence of anything in said article as to who the officers shall be, how many officers cities should have, or whether they should be elected or appointed. It follows, therefore, that, in the absence of such a provision, the Constitution of this State being an instrument of limitation upon the power of the Legislature, the courts of this country can not sit idly by and hold the acts of the Legislature unconstitutional upon the unwritten law of the land. The above cited clauses are all that the majority insist upon in the Constitution inhibiting this character of legislation.

However, the majority say the charter is unconstitutional anyway, whether or not there is a clause in the Constitution on the subject. If this be true, then we have no guide left for our judicial footsteps, and the division of this court on this question in itself shows absolutely the instability and lack of foundation for any such opinion. They say this matter is so plain it need not be written in the Constitution. I do not think it is so plain. And the question as to whether the next case that comes before us is so plainly unconstitutional as need not be written in the Constitution will not depend upon the solid rock of the Constitution, but upon the caprice and conceptions of the personnel of the court deciding the case. This is not construction. This is absolute destruction of our form of government. It is the duty of this court to support

the Constitution, and to construe laws solely with reference to the Constitution; and if there is no clause in the Constitution that prohibits the Legislature from passing an act, or unless there is implication from some clause in the Constitution that prohibits an act, this court has no warrant in law or custom to hold said act unconstitutional.

In the Hurlbut case, supra, Judge Cooley says that State government preceded town government. 24 Mich., 99, 9 Am. Rep., 103. Whether it did, or not, makes no difference, inasmuch as every writer in the United States says that municipal governments are the bare creatures of the Legislature. The legislative breath has made them, and the legislative breath can unmake them. If creature can dictate to the creator, and insist upon local self-government for the creature, and the creature alone can say to what extent it shall have local self-government, then the creator ceases to be the creator and becomes the creature.

It is sagely suggested in the majority opinion that the decision of the question is not meant as a reflection upon the Legislature, and Governor who signed the bill. This may be the individual feelings of the majority, but their opinion is a bill of indictment upon the patriotism of the Legislature as well as the Governor, because, when the legislative body, as the majority insist, have deliberately destroyed the right of free government—an innate constitutional right—this fact must necessarily reflect upon them; and, however kindly the court may feel towards the personnel of the Legislature, it still remains that, if this act is unconstitutional, it is, as stated, a bill of indictment upon the patriotism of the Legislature that passed it. Be this as it may, for this court to lay down the broad proposition that the Legislature of Texas is impotent to change any clause or provision of a charter as they have heretofore existed is such an innovation and construction of our Constitution and form of government, so at variance with the rules heretofore laid down, and so hampering upon the material and political prosperity of our State, I desire now to enter my most solemn protest against it. It follows from what I have said that there is nothing so plain that need not be written in the Constitution, and, whether or not the right of local self-government is invaded by this grant, it is constitutional, and there is nothing in the letter or spirit of the Constitution that remotely infringes upon the legislative right to create the charter with appointive officers for the stricken city of Galveston.

April 14, 1903.